UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

*******************************************************************

| | |
|---|---|
| THE WATER WORKS BOARD OF THE CITY OF BIRMINGHAM; WASHINGTON SUBURBAN SANITARY COMMISSION EMPLOYEES' RETIREMENT PLAN; ATLANTIC GLOBAL YIELD OPPORTUNITY MASTER FUND, L.P; AND ATLANTIC GLOBAL YIELD OPPORTUNITY FUND, L.P, <br><br>Plaintiffs, <br><br>vs. <br><br>U.S. BANK NATIONAL ASSOCIATION, <br><br>Defendant. | Case No: 4:17-cv-04113-LLP <br><br>MEMORANDUM OPINION AND ORDER ON DEFENDANT'S MOTION TO DISMISS |

*******************************************************************

Pending before the Court is Defendant's Motion to Dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. Doc. 25. The Court has considered the relevant pleadings and for the reasons set forth below, Defendant's motion is granted in part and denied in part.

## BACKGROUND

This case arises out of the purchase by Plaintiffs of approximately $25 million in bonds issued by Wakpamni Lake Community Corporation (Wakpamni Corp.), a South Dakota Native American tribal organization and an affiliate of the Oglala Sioux Tribe of the Pine Ridge Reservation, South Dakota. Those bonds were part of a scheme involving a series of sham Native American tribal bonds sold to unsuspecting investors, with the profits redirected to a group of criminal conspirators, defined by the Complaint as the "Criminal Defendants," including Jason Galanis—the scheme's main architect who has already pleaded guilty to criminal charges in the Southern District of New York—and his associate Hugh Dunkerley.

Beginning in March 2014, the criminal scheme had several components. First, the Criminal Defendants convinced the Wakpamni Corp. to issue the first series of Tribal Bonds with the promise that the proceeds would be used to fund community development projects. The trust

1

indenture for the August 2014 Offering provided that the net proceeds from the purchase of the bonds would be invested in a variable annuity which would fund interest and principal payments on the bonds. Wakpamni Corp could then draw certain amounts from the annuity to finance development projects for the tribe.

Next, on the eve of the first bond offering, an entity controlled by one or more of the Criminal Defendants purchased Hughes Capital Management LLC (Hughes), an SEC Registered Investment Advisor. Hughes had been the investment advisor of Plaintiffs Birmingham Water and Washington Suburban for many years and had discretionary authority over these Plaintiffs' accounts pursuant to investment agreements. Then, on or about August 25, 2014, Wakpamni Corp. issued $24,844,089 worth of Special Limited Revenue Bonds (Taxable), Series of 2014, and delivered them to U.S. Bank as Trustee under an Indenture Agreement of the same date (2014 Indenture). On August 26, 2014, the Birmingham Water and Washington Suburban accounts controlled by Hughes purchased $8,462,720 worth of tribal bonds in the offering.

An early draft of the 2014 Indenture was circulated to U.S. Bank and other offering participants and provided that, upon final execution of the indenture, Wakpamni Corp. was to execute and deliver to U.S. Bank a number of additional closing documents, including "[a] letter of appointment appointing Wealth Assurance AG as the investment manager with respect to the Annuity Investment." The Offering Distribution List, which identified the parties involved in the August 2014 Offering, and the Closing Agenda similarly listed "Wealth Assurance AG" as the "Annuity Provider." However, the final draft of the indenture omitted the requirement that a letter of appointment of Wealth Assurance AG be presented at closing. Instead, the final 2014 Indenture provided that the letter of appointment was to appoint Private Equity Management, Limited, as the investment manager. Further, at closing, Wakpamni Corp. was to execute and deliver to the Indenture Trustee:

> A Closing Statement signed by the President or Vice-President of the [Wakpamni Corp.] setting forth (i) the amount of the proceeds to be received by the [Wakpamni Corp.] from the sale of the 2014 bonds for funding the purchase of the Annuity Investment . . . ; (ii) the amounts to be paid or reserved for the costs and expenses of the financing; and (iii) the amounts to be deposited in the funds established under this Indenture.

At closing, U.S. Bank received a copy of a 25-year term annuity contract in the amount of $25,250,000 (Annuity Contract) which was issued by Wealth Assurance Private Client Corporation (Wealth Assurance BVI). The Annuity Contract identified Wealth Assurance BVI as

2

a British Virgin Islands entity authorized to do business only in the British Virgin Islands. The Annuity Contract also required that the annuity purchase payment be wire transferred to "a bank without any offices and/or branches in the United States." Dunkerly was the signatory for Wealth Assurance BVI on the Annuity Contract, though he was also listed as a primary representative of Burnham, the Placement Agent. He was also the signatory on the Placement Agency Agreement. This rendered Dunkerly the principal of both the Placement Agent and the Annuity Contract Provider, two parties to the same deal. The Closing Statement was also signed by Wakpamni Corp.'s President, Geneva Lone Hill. Also signed by Wakpamni Corps.'s President is a letter dated August 21, 2014 and addressed to U.S. Bank's Vice President "appoint[ing] Private Equity Management, Limited, as investment manager in connection with the purchase of the annuity investment from Wealth Assurance Private Client Corp. and direct[ing] them to take all actions necessary." Pursuant to the Annuity Contract, the bond proceeds were to be deposited into a separate segregated account and managed exclusively by Private Equity Management, LLC as investment manager, with U.S. Bank as the intended custodian of the investment portfolio. The Annuity Contract and the Investment Management Agreement, a copy of which U.S. Bank appears to have received with the August 21, 2014 letter, were also inconsistent as to who had authority to direct investments. The Annuity Contract granted Wakpamni Corp. no authority over the investments while the Investment Management Agreement provided that Wakpamni Corp. would provide investment guidelines to the manager, had the right to modify them, and could instruct the manager to "buy, sell or retain any investment." Ultimately, the net proceeds of the bond were never invested.

The 2014 Indenture also required that the value of the Investment Securities be determined at the end of each month according to directions established by agreement between Wakpamni Corp. and U.S. Bank. The term "Investment Securities" is defined to include the Annuity Contract itself. No such agreement was ever put in place and no valuation was conducted.

On August 26, 2014, U.S. Bank received instructions for transferring proceeds of the bond issuance to the annuity provider. These instructions were forwarded from Galanis to U.S. Bank by counsel for Burnham, Dilworth Paxson LLP (Dilworth). Galanis was listed on the Distribution List as a primary representative of Burnham, the Placement Agent. Wakpamni Corp. was not copied on the email nor did Wakpamni Corp. send U.S. Bank any directions regarding the disbursement of the proceeds. The instructions directed U.S. Bank to transfer the annuity purchase amount to an

entity named "Wealth Assurance Private Client Corporation," located in Santa Monica, California, with a JPMorgan Chase N.A. bank account in Beverly Hills, California (Wealth Assurance US). Wealth Assurance US is incorporated in Florida, not the British Virgin Islands, though the payment instructions did not provide this information.

In October 2014, the Criminal Defendants used $15 million of the proceeds of the August 2014 Offering, which they had stolen, and used them to purchase $15 million worth of newly issued Tribal Bonds (October 2014 Offering). U.S. Bank served as the indenture trustee of the October 2014 Offering as well. Then, in early April 2015, shortly before the April 2014 Offering, the parent company of Hughes, an entity controlled by the Criminal Defendants, acquired Atlantic Asset Management LLC (AAM) and caused it to merge with Hughes. Pursuant to an investment agreement, AAM had full discretion over Plaintiffs Atlantic Global Yield Opportunity Fund, L.P.'s (Feeder Fund) and Atlantic Global Yield Opportunity Master Fund, L.P.'s (Master Fund, together with Feeder Fund "GYOF") investments.[1] AAM caused GYOF to invest $16.2 million in Tribal Bonds as part of the April 2015 Offering. GYOF was the sole investor in the April 2015 Offering.

Payment instructions from the April 2015 Offering were included within the closing statement itself and signed by both Wakpamni Corp. and Burnham. U.S. Bank was again directed to send the proceeds to Wealth Assurance US, but this time to a different bank account that was not in Santa Monica, California. No payments were ever sent to Wealth Assurance BVI, the entity to which payment was supposed to be made pursuant to the Annuity Contract. The Annuity Contract associated with the April 2015 Offering also omitted the August 2014 Annuity Contract's requirement that the money be wire transferred to a bank outside of the United States. However, the April 2015 Annuity Contract still contained the warning that the issuer was not authorized to do business outside of the British Virgin Islands and that the purchase payment must be received at the "Home Office" (defined as the British Virgin Islands). The Investment Management Agreement for the April 2015 Offering also listed U.S. Bank as the custodian for the annuity investments. Again, because the net bond proceeds were stolen, no investments were made. Finally, as with the 2014 Indenture, the 2015 Indenture required the Investment Securities to be valued monthly according to a valuation method set forth by agreement between the Wakpamni

---

[1] AAM had been the investment advisor of the Omaha School Employees' Retirement System (OSERS), the sole limited partner of Feeder Fund. Feeder Fund invested all or substantially all of its assets in Master Fund. Thus, OSERS is the ultimate beneficial owner of Master Fund.

Corp. and U.S. Bank. Again, no such agreement was put in place and no valuations were conducted.

To avoid detection of their fraud, in fall 2015, the Criminal Defendants funded the first interest payments due on the August and October 2014 bonds—approximately $2.72 million. U.S. Bank distributed those funds to the investors. In 2016, however, the Criminal Defendants stopped funding interest payments, their fraud was uncovered, and they were charged with federal crimes.

## STANDARD OF REVIEW

A party may move to dismiss a complaint under Rule 12(b)(6) for "fail[ing] to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). The purpose of a motion to dismiss is to test "the sufficiency of a complaint." *M.M. Silta, Inc. v. Cleveland Cliffs, Inc.*, 616 F.3d 872, 876 (8th Cir. 2010). When ruling on a motion to dismiss, a court "must liberally construe a complaint in favor of the plaintiff," *Huggins v. FedEx Ground Package Sys., Inc.*, 592 F.3d 853, 862 (8th Cir. 2010), and accept as true all of the well-pleaded allegations contained in the complaint. *M.M. Silta*, 616 F.3d at 876. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

## ANALYSIS

Plaintiffs' Complaint contains allegations of breach of contract, breach of the implied covenant of good faith and fair dealing, and negligence. Plaintiffs allege Defendant breached its obligations under the indenture agreement by failing to disburse the proceeds to the proper person, failing to require proper written instructions from the Wakpamni Corp., failing to investigate material deficiencies and inconsistencies in the documents, failing to value or cause to be valued the Annuity Investment, and failing to notify the Wakpamni Corp. of breaches of the indenture agreement and potential fraud. Plaintiffs also assert that Defendant breached the implied covenant of good faith and fair dealing because good faith required more than "blindly following" the instructions of a "stranger" and required Defendant to question the recurrence of discrepancies between documents. Finally, Plaintiffs allege Defendant was negligent in sending the proceeds to

5

a sham entity; failing to ensure the instructions were genuine, signed by the right party, and reasonable and appropriate under the circumstances; failing to conduct an investigation; failing to value the Annuity investment, and failing to notify the Wakpamni Corporation and the Plaintiffs of breaches of the indenture agreement and the possibility of fraud.

Defendant moves to dismiss Plaintiffs' Complaint for failure to state a claim upon which relief can be granted for a number of reasons. First, Defendant argues that the indenture agreements expressly preclude Plaintiffs from seeking to impose liability on Defendant for failure to investigate, detect, and prevent the fraud. Next, Defendant states that it did not breach any contractual or implied duties, nor did it cause Plaintiffs' loss. Finally, Defendant asserts that Plaintiffs' negligence claim fails because Defendant owed Plaintiffs no independent duties outside the indenture contracts.

## BREACH OF CONTRACT

The Indenture Agreements designate the laws of the State of South Dakota as the governing law in the interpretation of the contract. The South Dakota Supreme Court has set forth its general principles of contract interpretation as follows:

> In interpreting a contract, we seek to ascertain and give effect to the intention of the parties; at the same time, to find the intention of the parties we rely on the contract language they actually used. *Malcolm v. Malcolm*, 365 N.W.2d 863, 865 (S.D. 1985). . . . It is a fundamental rule of contract interpretation that the entire contract and all its provisions must be given meaning if that can be accomplished consistently and reasonably. [*Dail v. Vodicka*, 89 S.D. 600, 603, 237 N.W.2d 7, 9 (1975)]. However, when provisions conflict and full weight cannot be given to each, "the more specific clauses are deemed to reflect the parties' intentions—a specific provision controls a general one." *State v. Greger*, 1997 S.D. 14, 21, 559 N.W.2d 854, 864. Ordinarily, the plain meaning of the contract will be followed unless there is some ambiguity or different intent manifested. *American State Bank v. Adkins*, 458 N.W.2d 807, 809 (S.D. 1990).

*Prunty Const., Inc., v. City of Canistota*, 682 N.W.2d 749, 756 (S.D. 2004) (quoting *Carstensen Contracting, Inc. v. Mid-Dakota Rural Water Sys., Inc.*, 653 N.W.2d 875, 877 (S.D. 2002)).

"The elements of a breach of contract are (1) an enforceable promise; (2) a breach of the promise; and (3) resulting damages." *Bowes Construction, Inc. v. South Dakota Dept. of Transp.*, 793 N.W.2d 36, 43 (S.D. 2010). Further, "[i]n every breach of contract case, there must be a causal relationship between the alleged damages sustained and the breach." *Morris, Inc. v. State, ex rel. State Dept. of Transp.*, 806 N.W.2d 894, 903 (S.D. 2011). This requires Plaintiff to show that the damages were "proximately caused [by]…or, which, in the ordinary course of things, would be

6

likely to result from" the breach. See S.D.C.L. § 21-2-1.[2] Although contract interpretation is a question of law, *Ziegler Furniture and Funeral Home, Inc. v. Cicmanec*, 709 N.W.2d 350, 354 (S.D. 2006), "[w]hether a contract has been breached is a pure question of fact for the trier of fact to resolve." *Weitzel v. Sioux Valley Heart Partners*, 714 N.W.2d 884, 894 (S.D. 2006).

Plaintiffs allege Defendant breached its obligations under the indenture agreement by failing to disburse the proceeds to the proper person, failing to require proper written instructions from the Wakpamni Corp., failing to investigate material deficiencies and inconsistencies in the documents, failing to value or cause to be valued the Annuity Investment, and failing to notify the Wakpamni Corp. of breaches of the indenture agreement and potential fraud. In its Motion to Dismiss, Defendant argues Plaintiffs' breach of contract claim fails for lack of breach of promise and lack of causation.

Specifically, Defendant argues that there is no breach of promise because there are no provisions in the Indentures that require 1) wire transfer instructions to have come from Wakpamni Corp.; 2) Defendant to investigate the location of Wealth Assurance; 3) Defendant to "alert" other parties of information; and 4) Defendant to conduct valuations. Further, Defendant argues that there is no causation because 1) it was the Criminal Defendants' stealing of the bond proceeds that left the bonds worthless, not Defendant's behavior; and 2) Plaintiffs' valuation argument assumes that U.S. Bank would conduct the valuation instead of Wakpamni Corp. and assumes that valuation would have uncovered the fraud.

The Indenture Agreements contain a limitation of liability clause which provides that U.S. Bank as Trustee

> [S]hall not be answerable for the exercise of any discretion or power under this Indenture or under any Supplemental Indenture, nor for anything whatever in connection with the trust, except only its own willful misconduct or negligence. The Trustee shall not be liable for any action taken by it in good faith and reasonably believed by it to be within the discretion or power conferred upon it, or omitted to be taken by it in good faith and reasonably believed by it not to be within the power or discretion conferred upon it, or taken pursuant to any direction or instruction by which it is governed under this Indenture or omitted to be taken by

---

[2] S.D.C.L. § 21-2-1 provides:
> For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom. No damages can be recovered for a breach of contract which are not clearly ascertainable in both their nature and their origin.

7

> it by reason of the lack of direction or instruction required for such action, including but not limited to investment of funds hereunder.

Doc. 150-3 at 41. Plaintiffs essentially maintain that all of Defendant's arguments for dismissal of the breach of contract claim fail for lack of consideration of this clause and the express obligation that Defendant must undertake its obligations under the Indenture Agreements in good faith. The Court agrees and finds that a factual question remains as to whether Defendant indeed carried out its obligations in good faith.

Section 10.9 of the Indenture Agreements specifically addresses the Trustee's reliance on documents without investigation by stating:

> The Trustee shall be fully protected and shall incur no liability in acting or proceeding in good faith upon any resolution, opinion, notice, telegram, request, requisition, consent, waiver, certificate, statement, affidavit, voucher, bond, or other paper or document which it shall in good faith believe to be genuine and to have been passed or signed by the proper board or person or to have been prepared and furnished pursuant to any of the provisions of this Indenture, and the Trustee shall be under no duty to make any investigation or inquiry as to any statements contained or matters referred to in any such instrument but may accept and rely upon the same as conclusive evidence of the truth and accuracy of such statements.

Doc. 150–3 at 43. Although Defendant relies on this provision to argue that they had no contractual obligation to investigate, the Court finds Plaintiffs' more nuanced reading of the provision to be more accurate. Any right to rely on instructions without investigation or inquiry is qualified by the "good faith" requirement that precedes it. "In other words, if U.S. Bank did not in good faith believe that the instructions it received were 'genuine and . . . passed or signed by the proper board or person," it would not be excused from inquiry. Again, a fact question remains as to whether Defendant in good faith believed that the instructions arrived at Defendant's door through the proper channels.

Defendant also argues that it cannot be held liable for "investment losses" under Section 5.8 of the Indenture Agreements which states that "[i]n no event shall the Trustee be liable for the selection of investments or for investment losses incurred thereon." However, this misconstrues the intent of the breach of contract claim. Plaintiffs are not trying to hold Defendant liable for the selection of their investments or losses on those investments. Instead, Plaintiffs seek to hold Defendant liable for allegedly failing to act in good faith in carrying out its contractual duties as Trustee, including valuing those investments. Section 1.2 of the Indenture Agreements provides that the value of the "Investment Securities," which is defined to include the Annuity Contract

itself, is to be determined at the end of each month according to an established agreement between the Defendant as Trustee and the Wakpamni Corp. There is no evidence that an agreement was put in place or that any valuations were done by either Defendant or Wakpmani Corp., a requirement clearly presented in the Indenture Agreement.

Finally, as to Defendant's argument that Plaintiffs have not set forth plausible facts which may establish causation, the Court disagrees. South Dakota law requires the damages to "in the ordinary course of things" be likely to result from the breach. *See* S.D.C.L. § 21-2-1. The Court finds the foreseeable that fraudulent activity could be enabled by the breach of an Indenture Agreement to be a factual question to be left for resolution by the finder of fact. Therefore, with respect to Plaintiffs' breach of contract claim, Defendant's Motion to Dismiss is denied.

## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

Plaintiffs also assert that Defendant breached the implied covenant of good faith and fair dealing because good faith required more than "blindly following" the instructions of a "stranger" and required Defendant to question the recurrence of discrepancies between documents. South Dakota law imposes upon every contract an implied covenant of good faith and fair dealing. *See Garrett v. BankWest, Inc.*, 459 N.W.2d 833, 841 & n. 7 (S.D. 1990). "This covenant affords only contract remedies, there is no independent tort for its breach." *Taylor Equip., Inc. v. John Deere Co.*, 98 F.3d 1028, 1031–32 (8th Cir. 1996). The South Dakota Supreme Court adopted for all contracts the definition of "good faith" found in South Dakota's uniform commercial code— "honesty in fact in the conduct or transaction concerned." S.D.C.L. § 57A–1–201(19). The duty of good faith thus permits an aggrieved party to bring an action for breach of implied covenant when the other party "by [its] lack of good faith, limited or completely prevented the aggrieved party from receiving the expected benefits of the bargain. A breach of contract claim is allowed even though the conduct failed to violate any of the express terms of the contract agreed to by the parties." *Garrett*, 459 N.W.2d at 841 (citations omitted). "The meaning of the covenant varies with the covenant varies with the context of the contract. Ultimately, the duty 'emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.'" *Nygaard v. Sioux Valley Hosps. & Health Servs.*, 731 N.W.2d 184, 194 (S.D. 2007) (quoting *Garrett*, 459 N.W.2d at 841).

Despite this imposition of South Dakota law, Plaintiffs do not point to, and the Court cannot find, any restriction South Dakota law has imposed on a party's freedom of contract and its ability

to contract over the implied covenant of good faith and fair dealing. The parties in this case did contract over such an obligation in Section 10.1 of the Indenture Agreements: "The Trustee hereby accepts the trusts imposed upon it by this Indenture and agrees to perform said trusts, but only upon and subject to the following express terms and conditions, and no implied covenants or obligations shall be read into this Indenture against the Trustee."[3] South Dakota public policy strongly favors freedom to contract. *Unruh Chiropractic Clinic v. De Smet Ins. Co. of South Dakota*, 782 N.W.2d 367, 372–73 (S.D. 2010). "Although freedom of contract is not absolute," Plaintiffs must identify policy concerns to justify abridging freedom of contract in the case at hand. *See Richland State Bank v. Household Credit Servs., Inc.*, 340 F.Supp.2d 1051, 1058–59 (D.S.D. 2004) (citing *Hieb v. Opp*, 458 N.W.2d 797, 801 (S.D. 1990); *Computrol, Inc., v. Newtrend, L.P.*, 203 F.3d 1064, 1070 (8th Cir. 200) (basis for enforcement of limitation of liability clause is strong public policy favoring freedom of contract)). Plaintiffs have not done so. Therefore, Plaintiffs' claim for breach of implied covenant of good faith and fair dealing is dismissed.

## NEGLIGENCE

Finally, Plaintiffs allege Defendant was negligent in sending the proceeds to a sham entity; failing to ensure the instructions were genuine, signed by the right party, and reasonable and appropriate under the circumstances; failing to conduct an investigation; failing to value the Annuity investment, and failing to notify the Wakpamni Corporation and the Plaintiffs of breaches of the indenture agreement and the possibility of fraud. "The three necessary elements of actionable negligence are: (1) a duty on the part of the defendant; (2) a failure to perform that duty; and (3) an injury to the plaintiff resulting from such a failure." *Kuehl v. Horner (J.W.) Lumber Co.*, 678 N.W.2d 809, 812 (S.D. 2004). However, to be liable in tort, there must be "a breach of a legal duty independent of contract." *Kreisers Inc. v. First Dakota Title Ltd. P'ship*, 852 N.W.2d 413, 419 (S.D. 2014). "This independent legal duty must arise from extraneous circumstances, not constituting elements of the contract." *Id.* (internal quotations omitted).

---

[3] The Court did, however, find three cases within the Eighth Circuit which the Court believes to be persuasive evidence of what the Supreme Court of South Dakota would do if the question were before it. When presented with the exact same language as presented in the Indenture at hand providing that "no implied covenants or obligations shall be read into this Indenture" all three cases expressed no hesitancy in finding the clause valid. *See Brooks v Arkansas-Louisiana Pipe Line Co.*, 77 F.2d 965 (8th Cir. 1935); *First Nat Bank v. Am. Lenders Facilities, Inc.*, 2002 WL 31163123 at *6 (D. Minn. 2002); *Higher Educ Loan Auth of the State of Missouri v. Wells Fargo Bank, N.A.*, 2011 WL 6010683 at *7 (E.D. Mo. 2011).

Plaintiffs in this case cite primarily to case law from the state of New York for support in asserting that "indenture trustees owe note holders an extracontractual duty to perform basic, nondiscretionary, ministerial functions redressable in tort if such a duty is breached." The caselaw demonstrates that the distinction between an ordinary trustee and an indenture trustee is an important one. "The leading authorities make clear that, unlike those of an ordinary trustee, the duties of an indenture trustee are generally defined by and limited to the terms of the indenture." *Harriet & Henderson Yarns, Inc. v. Castle*, 75 F. Supp. 2d 818, 830 (W.D. Tenn. 1999) (citing *Elliot Assocs. V. J. Henry Schroder Bank & Trust Co.*, 838 F.2d 66, 71 (2nd Cir. 1988); *LNC Inv., Inc. v. First Fidelity Bank*, 935 F. Supp. 1333, 1346 (S.D.N.Y. 1996); *Lorenz v. CSX Corp.*, 1 F.3d 1406, 1415 (3rd Cir. 1993) (applying New York law); *Meckel v. Continental Res. Co.*, 758 F.2d 811, 816 (2nd Cir. 1985); *Shawmut Bank, N.A. v. Kress Assocs.*, 33 F.3d 1477 (9th Cir. 1994) (applying California law)). Under New York common law, however, two additional duties are imposed upon an indenture trustee: 1) the duty to avoid conflicts of interest; and 2) the duty to perform basic, nondiscretionary, ministerial duties. *See LNC Inv., Inc.*, 935 F. Supp. at 1346 (S.D.N.Y. 1996). However, these Indenture Agreements are not governed by New York common law. They are governed by South Dakota law.

The Parties have not cited any South Dakota case law providing for additional common law duties for indenture trustees, specifically.

> However, we also observed in *Fisher Sand & Gravel Co.* [*v. South Dakota Dept. of Transp.*, 558 N.W.2d 864 (S.D. 1997)] if the relationship of the parties is such as to support a cause of action in tort, that cause of action is not to be denied because the parties happened to also have made a contract." *Id.* ¶ 19, 558 N.W.2d at 869 (quoting *Redgrave v. Boston Symphony Orchestra, Inc.*, 557 F. Supp. 230, 238 (D. Mass. 1983)). Furthermore, "it is generally recognized that one who undertakes to provide professional services has a duty to the person for whom the services are performed to use such skill and care ordinarily exercised by others in the same profession." *Limpert v. Bail*, 447 N.W.2d 48, 51 (S.D. 1989) (citation omitted). And, "[l]iability in tort for breach of that duty may arise as the result of negligence during the performance of the contract, even if there has been no breach of contract." *Id.* (citation omitted).

*Kreisers*, 852 N.W.2d at 420.

This Court has previously analyzed the "independent legal duty" doctrine under South Dakota law in light of *Kreisers*. In *GSAA Home Equity Trust 2006-2 ex rel. LL Funds LLC v. Wells Fargo Bank, N.A.*, 133 F. Supp. 3d 1203 (D.S.D. 2015), this Court declined to extend the "independent legal duty" doctrine to a claim where the plaintiff had merely alleged that the

defendant, a mortgage-backed securities trust servicer, entered into contracts in which they agreed to perform services in regard to the trust. "Courts in New York, Texas, and South Dakota have recognized that certain professionals 'may be subject to tort liability for failure to exercise reasonable care, irrespective of their contractual duties." *Id.* at 1222. "'Professionals' who have an independent duty to exercise reasonable care include lawyers, accountants, veterinarians, doctors, and architects." *Id.* at 1223 (internal citations omitted). "Courts have also found an independent duty when a party holds itself out to the plaintiff as an expert in a particular area." *Id.* (citing *Kreisers* for holding that "company owed independent duty of care to ascertain what type of like-kind property exchange client wanted where company advertised that it performed exchanges without limitation but did not actually perform the type of complex exchange the client desired."). The plaintiff in *GSAA Home Equity Trust* could not cite to any cases "holding that the servicer or master servicer of a mortgage-backed securities trust perform 'professional' services that give rise to an independent duty of care" nor "offer any facts or argument suggesting that the work was analogous to professions where courts have found such an independent duty," this Court dismissed the claim.

Plaintiffs have not yet offered any facts suggesting that the work of an indenture trustee is similar to that of lawyers, veterinarians, doctors, accountants, and architects—professions where South Dakota courts have found an independent duty. However, the Indenture Agreements themselves provide that U.S. Bank as Trustee "shall not be answerable for the exercise of any discretion or power under this Indenture or under any Supplemental Indenture, nor for anything whatever in connection with the trust, *except only its own willful misconduct or negligence*." Doc. 150-3 at 41 (emphasis added). Although "'this carve-out language' . . . by itself, does not excuse [Plaintiffs] from identifying an independent duty," *see GSAA Home Equity Trust*, 133 F. Supp. 3d at 1224, at this early stage of litigation, the Court does not have enough evidence before it to establish what would be expected of Defendant in the industry, nor what representations were made by Defendant regarding its expertise in this area prior to entering into the Indenture Agreements. Where discovery has not yet been completed and where the Indenture Agreement itself allows for liability in the case of willful misconduct or negligence, the Court cannot say as a matter of law that no independent legal duty exists in this case. Therefore, the Plaintiffs have presented enough plausible facts for their cause of action for negligence to survive this motion to dismiss.

## CONCLUSION

In liberally construing the complaint in favor of the Plaintiffs, the Court finds that Plaintiffs' allegations concerning breach of contract and negligence are pleaded with sufficient particularity to survive Defendant's Motion to Dismiss. However, Plaintiffs' claims for breach of implied warranty of good faith and fair dealing is dismissed. Accordingly,

IT IS ORDERED that Defendant's Motion to Dismiss, Doc. 25, is:

1. DENIED with respect to Plaintiffs' breach of contract and negligence claims; and
2. GRANTED with respect to Plaintiffs' breach of implied covenant of good faith and fair dealing claim.

Dated this 17th day of July, 2018.

BY THE COURT:

Lawrence L. Piersol
United States District Judge

ATTEST:
MATTHEW W. THELEN, Clerk of Courts

By_____, Deputy
(SEAL)

13