UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| THE WATER WORKS BOARD OF THE CITY OF BIRMINGHAM; WASHINGTON SUBURBAN SANITARY COMMISSION EMPLOYEES' RETIREMENT PLAN; ATLANTIC GLOBAL YIELD OPPORTUNITY MASTER FUND, L.P.; AND ATLANTIC GLOBAL YIELD OPPORTUNITY FUND, L.P., | CIV. NO. 4:17-CV-04113-LLP |
| Plaintiffs, | MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING MOTION TO EXCLUDE EXPERT TESTIMONY AND DENYING MOTION FOR SUMMARY JUDGMENT AND MOTION TO SEVER |
| vs. | |
| U.S. BANK NATIONAL ASSOCIATION, | |
| Defendant. | |

Pending before the Court are USB's Motion for Summary Judgment, Doc. 98, Motion to Exclude Expert Testimony of Peter Vinella, Doc. 109, and Motion to Sever, Doc. 112. For the following reasons, the Motion to Exclude Expert Testimony is granted in part and denied in part and the Motion for Summary Judgment and Motion to Sever are denied.

## BACKGROUND

**Anderson, Burnham and WLCC**

In 2013, Timothy Anderson ("Anderson") began doing legal work in the area of economic development for the Wakpamni Lake Community Corporation ("WLCC"). ("Statement of Material Facts "SOMF" 103.) WLCC is a corporation organized under the laws of the Oglala Sioux Tribe, a federally-recognized Indian Tribe, and the Wakpamni Lake Community[1], and is wholly-owned by the Wakpamni Lake Community. (SOMF 4.) In approximately April 2014, while Anderson was a partner in the law firm Dilworth Paxson, LLP, he attended a conference focused on tribal economic development and while there, was asked by

---

[1] The Wakpmani Lake Community is a subdivision of the Wakpamni Lake District, a subordinate governmental unit of the Oglala Sioux Tribe. SOMF 2-3.

WLCC to attend a meeting wherein John Galanis, father of Jason Galanis, presented the idea for issuing taxable revenue bonds to fund construction projects in the Wakpamni Lake Community. (SOMF 103-106.)  John Galanis (a/k/a "Yanni") connected Anderson with Burnham Securities, Inc. ("Burnham") based in New York, New York, and his son, Jason Galanis, to serve as the Placement Agent in the WLCC Bond offerings.  (SOMF 107.)

Hugh Dunkerley ("Dunkerley") was an investment banker at Burnham working on the WLCC bond deal.  (Pentelovitch Decl. Ex. 49, 1005:11-13.)  Burnham hired Anderson and his firm, Dilworth Paxon, to serve as its counsel in the WLCC bond offerings.  (SOMF 38, 45-46.) Anderson received written conflict waivers from Burnham and WLCC in order to represent Burnham in the WLCC bond issuances.  (SOMF 113.)

**Acquisition of Hughes Investment Management by GMT Duncan**

Dunkerley and Jason Galanis planned to acquire an investment advisor firm, Hughes Capital Management owned by Frankie Hughes, and have Michelle Morton ("Morton"), then a founder and CEO of GMT Duncan, run Hughes after the acquisition.  (Pentelovitch Decl., Ex. 48, Trial Tr. 932:17-933:15; SOMF 222.)  Hughes was a Registered Investment Advisor that had served for many years as the investment manager to each of Birmingham Water, Washington Suburban, and The Chicago Transit Authority Retiree Health Care Trust ("RHCT").  (SOMF 40.)  Hughes had discretionary authority to invest money for these entities within certain guidelines.  (Pentelovitch Decl. Ex. 4, Baker Dep. 20:8-21:2; Ex. 9, Johnson Dep. 82:2-12.)  The purchase of Hughes Capital would thus provide a client base for the bonds.  (Pentelovitch Decl. Ex. 48, Trial Tr. 933:9-12.)

In late August 2014, Washington Suburban and Birmingham Water were informed that GMT Duncan, owned by Morton, would be purchasing Hughes and that Frankie Hughes would be retained for two years after the purchase.  (Pentelovitch Decl. Ex. 4, Baker Dep., 32:7-23; Ex. 9, Johnson Dep. 98:8-13.)  On September 1, 2014, Hughes filed a Form ADV with the Securities and Exchange Commission listing GMT Duncan as the owner of Hughes effective August 12, 2014, and listing Morton and Richard Deary ("Deary") as partners in GMT Duncan.  (SOMF 351.)

**USB as Indenture Trustee**

Anderson had suggested the U.S. Bank National Association ("USB") would be a good fit as the indenture trustee on the WLCC bond offerings because USB was a well-known and reputable financial institution with "serious experience in tribal Indian Country."  (Murzyn Decl. Ex. 122, Trial Tr. 527-28.)   USB is a member of the Federal Deposit Insurance Corporation ("FDIC") and is a "financial institution" subject to the provisions of the Bank Secrecy Act ("BSA").  (SOMF 24, 25.)  USB is engaged in the corporate trust business through its division called Global Corporate Trust Services ("GCTS") and was known in the corporate trust industry as being one of the largest and most active indenture trustees in the market.  (SOMF 26; Murzyn Decl. Ex. 7, Graham Dep. at 58:19-59:16.)

Anderson contacted Keith Henselen ("Henselen") at USB to determine USB's interest and pricing to serve as indenture trustee on the WLCC bond issuances.  (Murzyn Decl. Ex 8, Henselson Dep. 27:10-21.)  USB's counsel, who had practiced in the area of indenture trusts and public finance since 1982, had not previously heard of Burnham prior to the WLCC Bond transactions, and neither Henselen, nor his supervisor Robert Von Hess ("Von Hess"), had any prior experience with Burnham.  (Murzyn Decl. Ex. 14, Slania Dep. 193:3-6; Ex. 8, Henselen Dep. 32:8-10; Ex. 16, Von Hess Dep. 47:8-15.)   A FINRA BrokerCheck Report indicates that Burnham had been sanctioned for disclosure issues prior to the WLCC bond issuances.  (Murzyn Decl. Ex. 113.)  Also unfamiliar to Henselen, Von Hess, and USB counsel prior to this deal were WLCC and the Annuity Provider, Wealth Assurance Private Client.  (Murzyn Decl. Ex. 14, Slania Dep. 192:3-18; Ex. 8, Henselen Dep. 22-25, 32:5-7, 205:15-206:4.)

USB did not perform any due diligence on the deal team members.  (SOMF 192.)  As part of its Know Your Customer review, USB obtained WLCC's name, address, federal tax identification number, and a copy of WLCC's Articles of Incorporation.  (SOMF 169, 191.)  At the time of the August 2014 bond issuance, USB policy classified customers engaging in payday loan activities as "high risk," and under USB policy, such accounts may require enhanced due diligence, formal approval, and increased monitoring.  (Murzyn Decl. Ex. 65.)  There were articles on the internet showing that WLCC may have been involved with payday lending although USB did not perform an internet search on WLCC prior to the August 2014 bond issuance.  (SOMF 191; Murzyn Decl. Ex. 18, Woodward Dep. at 57-59, 102-105; Ex. 51.)

Henselen testified that he could not recall doing any inquiry on WLCC's business type.  (Murzyn Decl. Ex. 8, Henselen Dep. 152:7-19.)

**August 2014 Bond Issuance**

USB classified the bonds as municipal bonds.  (SOMF 179.)  Most municipal bonds are issued to finance a particular project, but the nature of the tribal development project supporting the bond issuance was unclear from the start which counsel for USB acknowledged as being unusual.  (Murzyn Decl. Ex. 14, Slania Dep. 195:3-15; 205:8-16.)   A term sheet sent by Anderson to USB on July 1, 2014, suggested that part of the proceeds would be used to build a "distribution facility" without any additional detail about what would be distributed from the facility.  (Murzyn Decl. Ex. 7, Graham Dep. 78:6-79:8; Ex. 24.)  A draft of the indenture dated July 23, 2014, that was provided to USB's counsel suggested that the bond proceeds would be used to build a "gaming facility."  (Murzyn Decl. Exs. 35, 55.)  Under USB policy existing at the time, gaming was designated under USB policy as an additional risk factor that may render a customer account high risk, thus requiring additional due diligence.  (Murzyn Decl. Ex. 65.) Typically, a private placement memorandum describing the business purpose of the municipal bond transaction is provided, but no such memorandum was ever prepared with the WLCC bond issuances.  Contrary to custom and practice in the industry, no construction budget or plans for the development project were produced.  (Murzyn Decl. Ex. 14, Slania Dep. 204:22-205:16; Ex. 13, Pillar Dep. 104:17-105:04; Ex. 89.)  Henselen testified at his deposition that he could not recall what the economic development project was for the August 2014 bond issuance and did not recall ever seeing a construction budget.  (Murzyn Decl. Ex. 8, Henselen Dep. 206:13-23.)

The deal team members changed throughout the August 2014 bond deal.  In a draft Indenture emailed to USB on August 15, 2014, the designated Issuer changed from Wakpamni Lake Community Development Corporation to Wakpamni Lake Community Corporation and provided that WLCC shall deliver a letter to USB at closing appointing Wealth Assurance AG as the Investment Manager.  (Murzyn Decl. 8, Henselen Dep. 78:1-15.)   The draft Indenture received by USB on August 25, 2014, two days prior to closing, showed a change in the Investment Manager from Wealth Assurance AG to Private Equity Management, LLC.  (Murzyn Decl. Ex. 81.)

Ultimately, the Trust Indenture was executed on August 25, 2014, and provided that WLCC would be issuing $24,844,089[2] Special Limited Revenue Bonds (Taxable) to finance the purchase of an annuity investment in the amount of $22,094,089 as well as economic development projects for the benefit of the Wakpamni Lake Community, including "projects near the junction of Routes 18 and 391, including a certain warehouse/distribution center and other revenue producing enterprises."  In addition to the development project being ill-defined, another unique aspect of the deal was that it involved an annuity.  Deal team members and USB's expert testified that they had never been involved with a bond issuance involving an annuity, especially one that would finance nearly ninety percent of the principal and interest payments to bondholders.  (SOMF 109; Ex. 14, Slania Dep. 148:5-9; Ex. 1, Ambriz-Reyes Dep. 107:12-15; Ex. 16, Von Hess Dep. 22:19-23; Ex. 6, Gadsen Dep. 49:21-25.)  Despite the unusual structure of this bond issuance, Henselen indicated on the "Establish Deal" form that the sources for all assets and cash transfers were coming from known sources that fit the standard profile for this product.  (Pillar Decl., Ex. O.)

The Annuity Contract provided that the bond proceeds were to be invested in an annuity provided by Wealth Assurance Private Client in the British Virgin Islands.  The August 2014 Annuity Contract stated, wrongly, that Wealth Assurance Private Client was part of the Wealth-Assurance Group of Companies.  (Anderson Decl., Ex. D; Pentelovitch Decl. Ex. 49, Trial Tr. 1014:18-21.)  It happened that Wealth Assurance Private Client was not incorporated in the British Virgin Islands until August 22, 2014, just three days prior to closing.  (Pentelovitch Decl. Ex. 1.)

USB was not a signor to the Annuity Contract, but was the designated Payee and was granted a security interest in the payment stream from the Annuity Investment and in the revenue stream from the development project, but was not granted a security interest in the Annuity Investment.  (SOMF 237-239.)  USB's expert testified that it is important for an indenture trustee to ensure it is the payee on the guaranteed investment contract like the annuity contract in this case.  (Murzyn Decl. Ex. 6, Gadsen Dep. 63:23-64:6.)  However, Henselen testified that it was not his practice to review a guaranteed investment contract such as the Annuity Contract if USB was not a signor thereto.   (Murzyn Decl. Ex. 8, Henselen Dep. 63:22-64:4.)

---

[2] WLCC issued a second tranche on August 27, 2014, in the amount of $2,233,347.  The August 25, 2014, and the August 27, 2014, bonds are collectively referred to as the "August 2014 bonds."  (SOMF 7.)

The fact that the Annuity Provider was an overseas entity, that the Annuity Investment would be custodied overseas, and that the Annuity Contract was governed under the laws of the British Virgin Islands were all unusual components of this deal.  Henselen was first informed of that the Annuity Provider was a British Virgin Islands entity in July 2014 when he was emailed a "distribution list" listing all of the deal team members, their representatives, and associated contact information.  (Murzyn Decl. Ex. 26.)

Had Henselen reviewed the Annuity Contract that had been emailed to him a couple of weeks prior to the August 2014 closing[3] on the August 2014 bonds, he would have again seen that Wealth Assurance Private Client with its principal office in Tortola, British Virgin Islands was the designated Annuity Provider to which USB would be wiring over $22 million of the bond proceeds for the purchase of the Annuity Investment.  (Murzyn Decl. Ex. 22.)  Henselen testified that he was required to know about any overseas wires USB would make because there were certain reporting requirements associated with overseas wires.  (Murzyn Decl. Ex. 14, Slania Dep. 106-08; Ex. 7, Graham Dep. 76-77; Ex. 1, Ambriz-Reyes Dep. 77-79.)  Henselen's manager said that he would have expected Henselen to have reviewed any overseas annuity contract and to have brought to his attention that USB would be making overseas wires, but Henselen never did so.  (Murzyn Decl. Ex. 16, Von Hess Dep. at 54-55.)  The Annuity Contract provided that it was to be governed under the laws of the British Virgin Islands, although Henselen checked on the "Establish Deal" sheet that "[a]ll aspects of the transaction governed by U.S. Law."  (Pillar Decl., Ex. O.)  The Annuity Contract also provided that Wealth Assurance Private Client was "not authorized to do business in any jurisdiction other than the British Virgin Islands" and that the purchase payment must be received at the Home Office in the British Virgin Islands.   (Murzyn Decl. Ex. 27.)

The August 2014 Indenture provided that the proceeds of the August 2014 Bonds shall be deposited in USB's Settlement Account and from there, that USB would make payments, disbursements and deposits as set forth in the Closing Statement, including "the amount of $22,094,089 for the purchase of the Annuity Investment."  The Closing Statement, signed by authorized representatives of WLCC, provided that the August 2014 Bonds would be allocated

---

[3]   In the text of the email, Anderson wrote "Updated annuity contract and BVI attorney signed-off annuity documents." (Murzyn Decl. Ex. 27.)

as follows: 1) $22,094,089 for annuity purchase payment, 2) $2,250,000 for project fund, and 3) $500,000 for issuance costs, but did but not provide any instructions on where or how USB would transfer the $22,094,089 to Wealth Assurance Private Client.  "Annuity Investment" was defined in the August 2014 Indenture as "the contract, in the notional purchase amount of $22,094,089, entered into on the date hereof between [WLCC] and the Annuity Provider." "Annuity Provider" was defined in the August 2014 Indenture as "a company that provides Annuity Investments as part of its regular trade or business."

Section 12.3 of the August 2014 Indenture provided that:

> The Trustee shall have the right to accept and act upon instructions or directions pursuant to this Indenture sent by unsecured e-mail, facsimile transmission or other similar unsecured methods, provided, however, that the instructions or directions shall be signed by a person as may be designated and authorized to sign for the Corporation, who shall provide the Trustee an incumbency certificate listing such designated persons.

The persons designated and authorized to sign for WLCC relating to the August 2014 Bond Indenture, as detailed in the Certificate provided to USB, were Geneva Lone Hill, President of WLCC, and Wilma Standing Bear, Secretary of WLCC.  (Murzyn Decl. Ex. 95.)

On August 26, 2014, Jason Galanis, the Placement Agent with Burnham, sent an email to Anderson with wire instructions for the $22,092,089 that was to be transferred out of USB's settlement account for the purchase of the Annuity Investment and payment of certain closing costs.  The wire instructions were to a JP Morgan Chase Bank account in Beverly Hills, California, and the account holder was designated as Wealth Assurance Private Client with an address in Santa Monica, California.  Neither WLCC nor its counsel was copied on the email, and WLCC did not consent to any change in the Annuity Provider from Wealth Assurance Private Client, British Virgin Islands, to Wealth Assurance Private Client in California[4].  On August 27, 2014, Henselen's manager confirmed that the bank account information provided in the Galanis/Anderson email matched the wire information before USB completed the

---

[4] Wealth Assurance Private Client in the United States had been created by Gary Hirst in July 2014 as a Florida corporation.  (Pentelovitch Decl. Ex. 49, Trial Tr. 1011:20-1012:4.)  Dunkerley was the sole managing member and director.  (Pentelovitch Decl. Ex. 49, Trial Tr. 1011:20-1012:4.)  On August 6, 2014, Hirst opened a bank account for Wealth Assurance Private Client at JP Morgan Chase and Dunkerley became a signor on the account on August 21, 2014.  (Pentelovitch Decl. Ex. 49, 1013:2-15.)

$22,092,089 wire to the JPMorgan Chase Account in California. (Murzyn Decl. Ex. 16, Von Hess Dep. 101:5-102:7.)

**Plaintiffs Learn of 2014 Bond Issuance**

On or around September 2, 2014, after noticing that money was missing from its custodial account at Northern Trust in Chicago, Washington Suburban learned that Hughes had purchased August 2014 Bonds with a face value of $4,118,076 for its account. (SOMF 11, 353.) When Washington Suburban advised Hughes that the WLCC bonds were not a suitable investment for Washington Suburban's holdings with Hughes, Hughes responded in a letter dated September 2, 2014, signed by Morton and Deary, stating that they had "identified a non-gaming opportunity" in the WLCC bonds and stated, untruthfully, that the issuer was the "Oglala Sioux Tribe" which had "funded a long-term pension plan with the proceeds of the offering." (SOMF 356.) Washington Suburban instructed Hughes to stop trading in its account on September 8, 2014, and by letter dated September 26, 2014, notified Hughes that it was terminating its investment advisor relationship. (SOMF 366.)

The Chicago Transit Authority Retiree Health Care Trust ("RHCT") learned of GMT Duncan's acquisition of Hughes by letter dated August 22, 2014. (SOMF 378.) RHCT tasked its consultant to analyze whether RHCT should continue to engage the firm. (SOMF 378.) Following the investigation, RHCT was advised to terminate Hughes because of changes in ownership and management. (Pentelovitch Decl. Ex. 11, Kallianis Dep. 83:14-87:10.) By letter dated October 27, 2014, RHCT notified Hughes that their relationship would terminate on November 28, 2014, and that Hughes should liquidate RHCT's portfolio by that point. (SOMF 381.) Over the course of several months, RHCT received multiple communications from Morton and others about Hughes' supposed efforts to sell the bonds, but Hughes was unable to liquidate the WLCC Bonds. (SOMF 383; Pentelovitch Decl. Ex. 11, Kallianis Dep. 87:20-88:11.) [5]

By letter dated September 2, 2014, Birmingham Water received notice from Hughes that Hughes had purchased the August 2014 WLCC bonds for its account. (SOMF 373.)

---

[5] On May 6, 2020, USB and RHCT filed a Stipulation for Dismissal with Prejudice which this Court granted on May 7, 2020. Docs. 150, 151. RHCT is no longer a party to this action.

**Depletion of Funds from JPMorgan Account**

Dunkerley testified that he was the sole managing member and director of Wealth Assurance Private Client and had been designated by Hirst as a signor on the JPMorgan Chase Account on August 21, 2014.  (SOMF 314; Pentelovitch Decl. Ex. 49, Trial Tr. 1011:17-19.) Once USB had wired the $22,094,089 bond proceeds to the JPMorgan Chase account, Dunkerley received instructions from Jason Galanis to wire the money out of the account to certain individuals and corporations.  (SOMF 320, 331.)  One week after the August 2014 Bonds were issued, over $7.35 million had been withdrawn from the Wealth Assurance Private Client J.P. Morgan Chase Account.  (SOMF 339.)   All but slightly more than $1.2 million had been withdrawn from the account within four weeks after the August 2014 Bonds were issued. (SOMF 339.)

**Acquisition of Atlantic by Hughes**

Atlantic Investment Management, LLC ("Atlantic Investment Management") was a Registered Investment Advisor that for many years had served as an investment manager for the Omaha School Employees' Retirement System ("OSERS").  (SOMF 42.)  Atlantic Investment Management set up the Master Fund and Feeder Fund and made investments for the funds. (SOMF 43; Murzyn Decl. Ex. 4, Erikson Dep. 31:6-32:15.)  The Feeder Fund is the sole owner of the Master Fund and invested substantially all of its assets in the Master Fund.  (SOMF 14-15.)  In 2013, OSERS invested $100 million in the Feeder Fund and became the sole limited partner of the Feeder Fund.  (SOMF 16; Pentelovitch Decl. Ex. 6, Erickson Dep. 81:21-25.)

By letter dated February 19, 2015, from Atlantic Asset Management to Michael Smith, Executive Director of OSERS, Atlantic advised OSERS that it had signed a merger agreement with Hughes, and that the resulting combined business would use the Atlantic name. (SOMF 398.)  The letter advised OSERS that Morton was the CEO of Hughes and would become CEO of Atlantic, and that the Richard Deary was president of Hughes and would become president of Atlantic.  (SOMF 400.)  The letter furthermore asked OSERS to sign and return a "consent" to assignment of its investment management agreement to the newly merged entity.  (SOMF 401.) On March 4, 2015, Ron Sellers ("Sellers"), then the chairman and CEO and owner of Atlantic, made a presentation to OSERS recommending that OSERS invest an additional $25 million in the Atlantic Feeder Fund.  At the same meeting, Sellers represented to OSERS that he would

continue to be involved with Atlantic after the merger with Hughes and represented that the staff that OSERS had always dealt with would remain with the company.  (SOMF 403.)  Because Sellers was OSERS' long-time trusted advisor, OSERS relied on Sellers' recommendation and on March 16, 2015, approved continuation of the existing investment advisory agreement with Atlantic.  (SOMF 404, 406, 409.)  The Omaha Board of Education adopted the recommendation of the OSERS board.  (SOMF 407.)

The merger between Hughes and Atlantic was finalized in April 2015.  (SOMF 41.)

**April 2015 Bond Issuance, $16.2 Million Face Value**

USB's account acceptance procedures changed after the August 2014 bond issuance. The "Establish Deal" template was revised to include check boxes indicating whether a customer was involved with internet gambling, payday lending, or was a casino because such businesses were identified as prohibited and restricted business types.  (Pillar Decl. Ex. O; Murzyn Decl. Ex. 5, Farrell Dep. 162:4-171:8.)  The account acceptance template also included a check box indicating whether negative news has been obtained about the customer via a "Google" search on the internet.  (Pillar Decl. Ex. O.)  In the April 2015 "Establish Deal" form, Henselen indicated that WLCC was not involving in gaming or payday lending and that negative news had not been obtained via a "Google' search on the internet although he could not recall at his deposition doing any inquiry on WLCC's business type.  (Pillar Decl. Ex. O; Murzyn Decl. Ex. 8, Henselen Dep. 152:7-19.)    There were articles available on the internet linking WLCC to payday lending and gaming prior to the August 2014 bond issuance.  (Murzyn Decl. Ex. 18, Woodward Dep. 57-59, 102-105; Ex. 51.)

On behalf of Atlantic, Morton executed a "big boy" letter in connection with the purchase of the entire April 2015 bonds issue, wherein she represented, warranted and covenanted, among other things, that "(b) We have had such opportunity as we have deemed adequate to obtain from representatives of [WLCC] such information as is necessary to permit us to evaluate the merits and risks of our investment in [WLCC]" and "(c) We have sufficient experience in business, financial and investment matters to be able to evaluate the risks involved in the purchase of the Securities and to make an informed investment decision with respect to such purchase."  (SOMF 430.)  The big boy letter failed to state that the actual purchaser of the April 2015 bonds was not Atlantic but instead would be the Atlantic Master Fund.  (SOMF 431.)

The funds that Atlantic used to purchase the April 2015 bond for the Atlantic Master Fund came from the $25 million additional investment that OSERS had made in the Atlantic Feeder Fund in March 2015 on the recommendation of Sellers, the then-CEO of Atlantic. (SOMF 434.)  Atlantic Master Fund is the beneficial owner of the entire 2015 WLCC bond issuance with a face value of $16.2 million and the Atlantic Feeder Fund is the beneficial owner of Atlantic Master Fund's interest.  (Pentelovitch Decl. Ex. 2, Kirschner Dep. 46:1-6.)

As was true with respect to the August 2014 Bonds, with respect to the April 2015 Bonds, Burnham was the Placement Agent, Wealth Assurance Private Client in the British Virgin Islands was the Annuity Provider, and USB was Indenture Trustee.  (SOMF 414.)  USB signed the Indenture for the April 2015 bonds on April 1, 2015, and the Closing Statement on April 16, 2015.  (SOMF 415-417.)  The 2015 Indenture indicated that WLCC would be issuing $16,200,000 Special Limited Revenue Bonds (Taxable), the proceeds of which would be used to help finance the purchase of an annuity investment with a nominal purchase amount of $19,650,000[6] and to finance the Economic Development Project which was defined therein as "a consumer goods distribution project to be located on the Tribe's lands, including the equipment, inventory, operating capital and infrastructure, and other legal purposes for the benefit of the Wakpamni Lake Community."

As with the August 2014 bond issuance, USB was identified as the Payee and was granted a security interest in the payment stream from the Annuity Investment and in the revenue stream from the project, but was not granted a security interest in the Annuity Investment. (SOMF 237-239, 418, 423-24.)  In large part, the August 2014 and April 2015 Indentures and Annuity Contracts were substantially identical in form and substance.  (SOMF 427.)  The purchase price of the April 2015 Annuity Investment was $19,650,000 and was for a seven-year term.  On the front page of the 2015 Annuity Contract term sheet, the annuity provider was designated as Wealth Assurance Private Client with a principal place of business in Tortola, British Virgin Islands and provided that it was "not authorized to do business in any jurisdiction other than the British Virgin Islands."  The April 2015 Annuity Contract also provided that the

---

[6] The April 2015 Annuity Contract provided that the purchase payment for the annuity was payable in two installments by WLCC.  The first installment of $15,850,00 was payable on or before the Contract Date of April 16, 2015, and the second payment of $3,800,000 was payable on or before thirty days form the Contract Date.  The April 2015 Annuity Contract provided for the adjustment of incoming payments in the event the second payment was not made.

purchase payment was to be received by Wealth Assurance Private Client at its home office in the British Virgin Islands.  Private Equipment Management LLC was identified in the Annuity Contract as the Investment Manager, although it appears no investment agreement was executed for the 2015 bond issuance.  (SOMF 427.)  The April 2015 Closing Statement differed from the August 2014 Closing Statement in that it included the wire instructions to Wealth Assurance Private Client's JP Morgan Chase bank account in Beverly Hills, California, which was the same account specified in wire instructions provided in the Galanis/Anderson email to USB in August 2014, and to which USB wired the August 2014 Bond proceeds.

**Post-April 2015 Bond Issuance**

On April 23, 2015, OSERS discovered that Atlantic had purchased the April 2015 WLCC bonds.  (SOMF 433, 435.)  According to OSERS, the acquisition of the April 2015 Bonds by the Master Fund violated the guidelines contained in the OSERS' investment management agreement with Atlantic because, among other reasons, the investment was too large.  (SOMF 432; Pentelovitch Decl. Ex. 4, Erikson Dep., 94:10-19; Kirschner Dep. 48:23-49:9, 52:9-13.)   OSERS complained to Atlantic and demanded that the transaction be reversed and that the purchase price be placed back in the Master Fund.  (SOMF 435.)

Immediately prior to the April 2015 bond transaction, the balance in WAPCC's bank account at J.P. Morgan Chase was $54.66.  (SOMF 440.)  After funds from the April 2015 bond transaction were wired by USB to WAPCC's bank account at J.P. Morgan Chase, such funds were withdrawn and used for, among other things, working capital for Hughes and to purchase the corporation Fondinvest, of which Dunkerley was president.  (SOMF 441.)  Within one week after the April 2015 bonds were issued $6.47 million had been withdrawn from WAPCC's bank account at J.P. Morgan Chase.  (SOMF 442.)  Within four weeks after the April 2015 bonds were issued, all but $20,993.30 had been withdrawn from the account.  (SOMF 442.)  Atlantic Asset Management and Hughes were placed into receivership by the United States District Court for the Southern District of New York upon the petition of the Securities and Exchange Commission.  (SOMF 459.)

**Criminal Charges**

On January 19, 2017, Jason Galanis pleaded guilty in the United States District Court for the Southern District of New York to securities fraud, conspiracy to commit securities fraud, and conspiracy to commit investment advisor fraud in connection with the WLCC Bond transactions. (SOMF 461.)  According to Jason Galanis' plea allocution, he agreed with others to withhold material information related to conflicts of interest in connection with the purchase and sale of bonds, and he agreed with others to engage in deceptive and manipulative business transactions in connection with an investment advisor.  (SOMF 462.)  On August 11, 2017, the court sentenced Jason Galanis to 173 months imprisonment and he was ordered to forfeit $43,277,436. (SOMF 463.)  On October 28, 2019, the United States Court of Appeals for the Second Circuit remanded Jason Galanis' case back to the district court for a hearing upon his claim that he had ineffective assistance of counsel in connection with his guilty plea.  (SOMF 464.)  On November 26, 2019, the court granted Jason Galanis' November 15, 2019, motion to vacate his conviction in order to "facilitate a resolution of the case by plea in the WLCC bond case as well as another criminal case pending against Jason Galanis.  (SOMF 465.)

On June 13, 2017, Dunkerley pleaded guilty in the United States District Court for the Southern District of New York to conspiracy to commit securities fraud, two counts of securities fraud, bankruptcy fraud, and falsification of records with the intent to obstruct a government investigation.  (SOMF 469.)  According to Dunkerley's plea allocution, he pleaded guilty to, among other things, misappropriating proceeds of several bond issuances by making or directing transfer of proceeds to persons and entities not entitled to the funds, and by submitting false documents in connection with subpoenas served by the Securities and Exchange Commission. (SOMF 470.)

On May 16, 2018, Morton pleaded guilty to investment fraud and conspiracy to commit securities fraud in the United States District Court for the South District of New York.  (SOMF 472.)  Morton's guilty plea related to actions she took as chief executive officer of Atlantic Asset Management in connection with the April 2015 bond transactions.  (SOMF 473.)  As described by Morton, her crime was that she "agreed with others to purchase bonds for a client account at Atlantic . . . and knew there was a material conflict of interest in connection with the bonds and did not disclose it to the client before making the purchase."  (SOMF 473.)  On June 20, 2018,

Morton made a motion to withdraw her guilty plea and renewed her motion on May 17, 2019. (SOMF 474.)[7]

Hirst pleaded guilty in the United States District Court for the Southern District of New York to conspiracy to commit securities fraud, securities fraud, conspiracy to commit investment advisor fraud, and investment advisor fraud. (SOMF 475.) According to Hirst's plea allocution, he agreed with others to deceive certain clients of Hughes by not disclosing conflicts of interest of which he was aware prior to Hughes purchasing certain bonds on behalf of its clients and knowing that the clients would have wanted to know about those conflicts of interest before approving the bond purchase. (SOMF 475.) On September 11, 2019, Hirst moved to vacate, set aside, or correct his sentence and the court has not ruled on Hirst's motion. (SOMF 477.)

## DISCUSSION

### I.      Motion to Exclude Expert Testimony

Pending before the Court is USB's Motion to Exclude Expert Testimony. Doc. 109.

Proposed expert testimony must meet three prerequisites to be admissible under Federal Rule of Evidence 702. *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001). "First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact." *Id.* "[I]t is the responsibility of the trial judge to determine whether a particular expert has sufficient specialized knowledge to assist jurors in deciding the specific issues in the case." *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 715 (8th Cir. 2001). Second, the proposed expert must be qualified. *Lauzon*, 270 F.3d at 686. Third, the proposed evidence must be reliable. *Id.*

"Courts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 758 (8th Cir.2006). "As a general rule, the factual basis of an expert's opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001) (citation omitted). However, an expert's opinion must be excluded if it "is so fundamentally unsupported

---

[7] The district court held three-day evidentiary hearing from March 2, 2020 until March 5, 2020 on Morton's Renewed Motion to Withdraw Guilty Plea. *United States v. Morton*, Civ. No. 1:16-cr-00371 (S.D.N.Y.). On April 2, 2020, Morton and the Government both filed post-hearing memorandums of law with regard to Morton's Renewed Motion to Withdraw Guilty Plea. Docket 873, 874. The Court has not yet ruled on Morton's motion.

that it can offer no assistance to the jury." *Id.* at 929–30 (citation omitted).  The proponent of the expert testimony bears the burden of proving its admissibility by a preponderance of the evidence.  *Lauzon*, 270 F.3d at 686 (citing *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 592 (1993)).

### A. Know Your Customer/Anti-Money Laundering "KYC/AML" Standard of Care

KYC/AML customs and practices are not within the common knowledge of laypersons and the Court finds that Vinella is qualified to testify to such matters, and that his experience in reviewing and drafting such policies will aid the jury in its understanding of this issue.  Vinella played a lead role in drafting KYC/AML policies and procedures for Citibank's Global Private Bank BSA and for a number of other banks. (Druck Decl. Ex. B, Vinella Dep. 173:7-22.)  While serving as President and CEO of Wilmington Trust Conduit Services ("WTCS"), Vinella evaluated Wilmington Trust's KYC/AML procedures and drafted new KYC/AML policies and procedures that applied to issuances of all types of securities.  (Murzyn Decl. Ex. 124, Vinella Dep. 106:14-107:3; Druck Decl. Ex. B, 167:21-170:8, 204:2-10 ("There is no difference from doing a KYC for a municipal issuer, for a tribal bond, for Frank down the street.  It doesn't matter what the issuer is, there is not a different standard.")).  Accordingly, the Court concludes that Vinella is qualified to testify as to the KYC/AML customs and practices of indentured trustees and as to risk factors that, in his experience, would have prompted an experienced and knowledgeable corporate trust department to apply heightened scrutiny to this deal.  Any deficiencies in Vinella's experience with implementing KYC/AML policies at the deal level may be explored by USB on cross- examination.

### B.  Municipal Bond Classification

Vinella opines that the WLCC Bonds should not have been classified as municipal bonds because, among other things, they were taxable and because an annuity was the primary source of principal and interest repayment.  The Court concludes that Vinella is qualified to opine on whether the WLCC Bonds were properly classified as municipal bonds.  Vinella served as head of taxable fixed-income research at DBL and of proprietary trading at Smith Barney Shearson. (Druck Decl. Ex. C, Vinella Rebuttal Report. ¶ 60.)   In this position with Smith Barney Shearson, Vinella would have been allowed to purchase taxable, fixed-income securities like the WLCC Bonds, but was prohibited from trading standard tax-free municipal securities.  (Druck Decl. Ex. C, Vinella Rebuttal Report ¶ 60.)  In addition, Vinella oversaw the operations of an

IDB which traded thousands of municipal bonds daily.  (Druck Decl. Ex. C, Vinella Rebuttal Report ¶ 61.)  Any gaps in Vinella's knowledge relating to municipal bond classification may be explored on cross-examination and USB witnesses and experts can offer competing testimony as to the proper classification of the WLCC bonds.

### C.  Due Diligence Standard of Care

USB argues that Vinella's testimony on the due diligence obligations of an indenture trustee prior to accepting a mandate are unreliable because, it contends, that WTCS did not serve as an indenture trustee on these deals, but rather signed the indenture as an institution providing services defined in the indenture such as processing wires, holding assets in collateral, and evaluating collateral.  (Reply Br. at 4-5 (citing Druck Decl. Ex. B, Vinella Dep. 132)).  USB argues further that Vinella's opinions are unreliable because WTCS was not involved with government-issued securities.  (Reply Br. at 6.)

While at WTCS, Vinella was involved in 18 bond deals that closed and over 60 deals that did not close.  (Druck Decl. Ex. B, Vinella Dep. 116:22-23; 133:14-12.)  Vinella testified that he was personally involved in KYC analysis on these deals and testified to the type of due diligence that he performed.  (Druck Decl. Ex. B., Vinella Dep. 102:9-14.)  This included a KYC on any unfamiliar deal team members, including a Google search; a review of every document, including the indenture; a collateral administration agreement, custody agreement, private placement memorandum, and investment management agreement.  Even though WTCS was not a signatory to each and every document, Vinella testified that those documents often had references to the work WTCS did as trustee.  (Druck Decl. Ex. B, Vinella Dep. 102:23-103:12; 107:4-108:5, 114-116:21.)

Of the 18 transactions that Vinella was involved in which closed, all of them were private placements which are exempted from the Trust Indenture Act and thus did not require an institutional trustee.  (Druck Decl. Ex. B, Vinella Dep. 132:2-16.); 15 U.S.C. § 77d(2).  WTCS thus signed the indentures not as an institutional trustee, but as a provider of services defined in the indenture such as processing wires, holding assets in collateral, and evaluating collateral.  (Druck Decl., Ex. B, Vinella Dep. 132.)  WTCS was an unregulated entity and thus had a contractual relationship with Wilmington Trust Bank to provide any services that needed to be done by a licensed financial institution.  (Druck Decl. Ex. B, Vinella Dep. 111:17-23.)  Vinella testified that because the transactions at WTCS were private placements, WTCS was considered

to be a "collateral agent, valuation agent," not a trustee under the Trust Indenture Act.  (Druck Decl. Ex. B, Vinella Dep. 132:13-16.)   Vinella testified that had they done "public deals," Wilmington Trust Bank would have signed the indenture as the institutional trustee under the Trust Indenture Act and would have outsourced operations to WTCS.  (Druck Decl. Ex. B, Vinella Dep. 132:17-22.)

The Court concludes that although not specifically labelled as such in the indentures, WTCS's duties, at least pre-default, were largely representative of those of an indenture trustee.  Furthermore, the deals that WTCS were involved with were, like the WLCC Bond deals, private placements rather than public offerings.  (SOMF 9.)  The Court concludes that the opinions of Vinella as to the standard of care prior to accepting a mandate in a private placement bond offering are reliable and will be of aid to the jury.  On cross-examination, USB may explore any gaps in Vinella's experience performing due diligence on municipal bond transactions and have its own experts present competing standards of care.

### D.  Wire Instructions

USB argues that Vinella's lack of experience at the deal level disqualifies him from opining on whether USB should have done further inquiry rather than acting on instructions from Galanis/Anderson.  (Reply Br. at 12.)  The Court disagrees.    Vinella reviewed many indentures throughout his career.  (Murzyn Decl. Ex. 124, Vinella Dep. 88:18-90:18.)  While at WTCS, the company's duties under the indentures included automating wire requests for bond transactions.  (Druck Decl. Ex. B, Vinella Dep. 83:16-86:49.)  The Court concludes that Vinella's opinion on this subject is thus reliable.

### E.  Valuation

Vinella opines that USB had a duty under the Indentures to value the Annuity Investments on a monthly basis.  (Druck Decl. Ex. A, Vinella Report. 151.a.)  Vinella will not be permitted testify as to any of USB's duties that are defined in the Indentures because a party's contractual duty is question of law for the court.  *See Roseth v. Roseth*, 829 N.W.2d 136, 142 (S.D. 2013) (stating that contract interpretation is a question of law).  However, Vinella may be permitted to testify as to the valuation customs and practices of indenture trustees in the industry.  *See id.*

### F.     USB Policies and Procedures

Under South Dakota law, internal company policies and procedures may be considered by the jury as evidence of negligence, although it does not establish negligence per se.  *Morrison v. Mineral Palace Ltd. P'ship*, 603 N.W.2d 193, 197 n.4 (S.D. 1999).  In *Morrison v. Mineral Palace Ltd. Partnership*, it was established at trial that the defendant had a duty to maintain the sidewalks abutting his property in reasonably safe condition.  *Id.*  The court stated that company policy directing employees to inspect sidewalks for ice after dark could be considered by the jury in determining whether failure to do so breached any legal duty the defendant owed to the plaintiff.  *Id.*

Vinella will be allowed to testify to any instances in which USB failed to comply with its internal policies and procedures. As in *Morrison*, the jury may consider whether such noncompliance breached any legal duty owed by USB to Plaintiffs.

### G.     State of Mind Testimony

Vinella opines on what actions USB *should* and *would* have taken if USB had acted in accordance with industry customs and standards and USB policy.  Vinella will not be permitted to testify to actions USB would have taken, but may testify to what actions an indenture trustee should take.  *See, e.g.*, *Kruszka v. Novartis Pharm. Corp.*, 28 F. Supp. 3d 920, 931 (D. Minn. 2014) (citation omitted) (stating that expert testimony on "the intent, motives, or states of mind of corporations, regulatory agencies and others have no basis in any relevant body of knowledge or expertise.").

### H.     Causation

Vinella will be permitted to offer his opinion providing that had USB met the standards of care of an indenture trustee, the WLCC bonds would not have been issued and Plaintiffs' losses would have been averted.  (Druck Decl. Ex. A, Vinella Report ¶¶ 15(c), 17; Ex. C, Vinella Rebuttal Report ¶ 128.)  The Court will provide the jury a cautionary instruction that whether USB breached the standards of care of an indenture trustee and whether such breach was the cause of Plaintiffs' damages are questions for the jury to decide even though the Court will allow witnesses determined to be experts to offer their opinions on those subjects for their assistance to the jury.  Vinella will be allowed to testify that an experienced and knowledgeable trust department would have declined to serve as indenture trustee to this deal.

## II.   USB's Summary Judgment Motion

### A.  Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate where "there is no dispute as to any material fact and the movant is entitled to a judgment as a matter of law."   Fed. R. Civ. P. 56(a).   "The movant 'bears the initial responsibility of informing the . . . district court of the basis for its motion,' and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'"   *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2001) (en banc) (quoting *Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986)).   Once the motion for summary judgment is made and supported, it places an affirmative burden on the non-moving party to go beyond the pleadings and cite to particular parts of materials in the record, showing that there is a genuine issue for trial.   *See Commercial Union Ins. Co. v. Schmidt*, 967 F.2d 270, 271 (8th Cir. 1992); Fed. R. Civ. P. 56(c).   The nonmovant must do more than "assert[] 'the mere existence of some alleged factual dispute between the parties'; the [nonmovant] must assert that there is a 'genuine issue of material fact'"   *Quinn v. St. Louis Cnty.*, 653 F.3d 745, 751 (8th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) (emphasis omitted)).

### B.  Negligence Claim

#### 1.  *Independent Duty*

"Tort liability requires a breach of a legal duty independent of contract.'"   *Kreisers Inc. v. First Dakota Title Ltd. P'ship*, 852 N.W.2d 413, 419 (S.D. 2014) (internal quotation and citation omitted).   "This independent legal duty must arise from extraneous circumstances, not constituting elements of the contract."   *Id.* (internal quotation and citation omitted).   In contrast, "negligence that consists merely in the breach of a contract will not afford grounds for a tort action by third parties and is limited under a breach of contract cause of action . . . ."   *Id.* (quoting *Fisher Sand & Gravel Co. v. S.D. Dep't of Transp.*, 558 N.W.2d 864, 868 (S.D. 1997)).

"[I]t is generally recognized that one who undertakes to provide professional services has a duty to the person from whom the services are performed to use such skill and care ordinarily exercised by others in the same profession."   *Id.* at 420 (quotation omitted).   "Liability in tort for breach of that duty may arise as a result of negligence during the performance of the contract, even if there has been no breach of contract."   *Id.*   "[T]he existence of a duty, *i.e.*, whether a

19

relation exists between the parties such that the law will impose upon the defendant a legal obligation or reasonable conduct for the benefit of the plaintiff . . ." is for the court to determine, as a matter of law.  *Schoenwald v. Farmers Coop. Ass'n of Marion*, 474 N.W.2d 519, 520 (S.D. 1991).

In *Kreisers*, *Inc. v. First Dakota Title Ltd. Partnership*, the plaintiff was referred to First Dakota Bank to facilitate its § 1031 tax-deferred construction exchange.  852 N.W.2d at 416. Prior to signing any closing documents, First Dakota had advertised that it could provide § 1031 tax deferred exchange services.  *Id.*  First Dakota did not advertise any limits on the types of § 1031 services it provided, although its policy was to only handle forward or delayed exchanges. *Id.* at 416-17.  First Dakota was aware of the differences between types of § 1031 exchanges and commonly had a policy of referring more complex exchanges like construction exchanges to other providers.  *Id.* at 420.  Despite that, representatives from First Dakota did not ascertain whether the plaintiff wanted anything other than a forward exchange.  *Id.*  The court concluded that in providing these complex § 1031 exchanges, First Dakota was performing professional services and had, at a minimum, an independent legal duty to exercise reasonable care by ascertaining whether a client desired a forward exchange (a transaction it was competent to perform) or some other type of  §1031 exchange such as the construction exchange plaintiff wanted (and which First Dakota was not competent to perform).  *See id.* at 420-21.  The court noted that the plaintiff's expert had opined that First Dakota "breached the standard of care as a qualified intermediary by failing to gather necessary information and failing to make certain it understood what the client was trying to accomplish and how the transaction was structured." *Id.* at 421.  The court concluded that this duty of reasonable care existed independent of the closing contract that the parties subsequently signed.  *Id.*

In the present case, USB held itself out as and was known as experienced and reputable indenture trustee in the corporate trust industry.   Anderson had suggested that USB would be a good fit as the indenture trustee on the WLCC Bond Offerings because it was a large, well-known and reputable financial institution with "serious experience in tribal Indian Country." (Murzyn Decl. Ex. 122, Trial Tr. at 527-28.)  In fact, USB was known in the corporate trust industry as one of the largest and most active indenture trustees in the market.  (Murzyn Decl. Ex. 7, Graham Dep. 58:19-59:16.)  USB's expert testified that the WLCC bonds were a complex

municipal transactions.  (Murzyn Decl. Ex. 6, Gadsen Dep. 152:6-9.)  Similar to the financial transaction in *Kreisers*, there were several features of these bond transactions that were outside USB's typical municipal bond experience.  (*See* Murzyn Decl. Ex. 6, Gadsen Dep. 160:19-161:13.)

USB's expert, and others, testified that a trustee should understand the purpose of a municipal bond issuance since they are typically made to finance specific projects.  (Murzyn Decl. Ex. 6, Gadsen Dep. 159:12-160:18; Ex. 14, Slania Dep. 204:8-21; *see also* Pentelovitch Decl. Ex. 7, Farrell Dep. 69:22-70:22.)   From the outset, however, the nature of development project was ill-defined.  (Murzyn Decl. Ex. 14, Slania Dep. 195:12-15 (recognizing that it was unusual to have no defined development project at the outset of a bond transaction)).  A term sheet sent by Anderson to USB on July 1, 2014, suggested that part of the proceeds would be used to build a "distribution facility" without any additional detail about what would be distributed from the facility.  (Murzyn Decl. Ex. 7, Graham Dep. 78:6-79:8; Ex. 24.)  A draft of the indenture dated July 23, 2014, that was provided to USB and its counsel suggested that the bond proceeds would be used to build a "gaming facility."  (Murzyn Decl. Exs. 35, 55.)  USB policy required an account manager to escalate a review of a transaction if gaming was an intended use and by the time the 2015 bonds were issued, internet gambling was officially designated on the "Establish Deal" form as a prohibited business and payday lending, a "restricted business."  (Murzyn Decl. Ex. 8 Henselen Dep. 151:1-18; 152:3-10; Ex. 16, Von Hess Dep. 65:17-66:3.)  Henselen's supervisor testified that if he had been made aware as an account manager that a client was potentially involved in gaming, he would raise that issue with his manager.  (Murzyn Decl. Ex. 16, Von Hess Dep. 65:17-67:9.)  Additionally, USB never received a private placement memorandum which was unusual in a private placement bond offering.  (Murzyn Decl. Ex. 6, Gadsen Dep. 122:1-123:1; Ex. 1, Ambriz-Reyes Dep. 124:24-125:18.)  Ambriz-Reyes, an account manager at USB, testified that in her thirty-five years of corporate trust experience, she could not remember any bond transaction in which she had been involved with as an indenture trustee in which there was no private placement or offering memorandum prepared for the transaction.   (Murzyn Decl. Ex. 1, Ambriz-Reyes Dep. 124:24-125:18.)  Additionally, it was unusual in municipal bond transactions for an issuer not to produce a budget or construction plans.  (Murzyn Decl. Ex. 14, Slania Dep. 204:22-205:16; Ex. 13, Pillar Dep. 104:17-105:04; Ex. 89.)  Henselen testified that he did not recall ever seeing a construction

budget for the development projects associated with the WLCC bonds.  (Murzyn Decl. Ex. 8, Henselen Dep. 206:13-23.)

In addition to understanding the purpose of a municipal bond issuance, USB's expert testified that an indenture trustee must understand the characteristics of a bond transaction. (Murzyn Decl. Ex. 6, Gadsen Dep. 159:12-160:18.)   There were several attributes of the WLCC bond transactions that were unique and USB's own policies flagged some of these attributes as escalating the risks associated with the deal.  While the details of the development project were unclear, what was clear from the beginning was that approximately ninety percent of debt associated with the August 2014 WLCC bond issuance would be serviced by an annuity investment.  Neither the parties, their representatives, nor experts in this case had ever heard of a municipal bond transaction involving an annuity.  (SOMF 109; Ex. 14, Slania Dep. 148:5-9; Ex. 1, Ambriz-Reyes Dep. 107:12-15; Ex. 16, Von Hess Dep. 22:19-23; Ex. 6, Gadsen Dep. 49:21-25.)  Despite the presence of this unique attribute, Henselen, the account manager of the WLCC bond issuances at USB, indicated on the "Establish Deal" form that the sources for all assets and cash transfers were coming from known sources that fit the standard profile for this product. (Pillar Decl. Ex. O.)

It was also known at the outset of the deal that the Annuity Provider was an entity in the British Virgin Islands.  On July 11, 2014, Henselen received an email from one of the lawyers in the 2014 WLCC bond deal which attached a "distribution list" identifying all of the parties, their representatives, and associated contact information.  (Murzyn Decl., Ex. 26.)  Therein, it identified the Annuity Provider as Wealth Assurance Private Client with a home office in Tortola, British Virgin Islands.  (Murzyn Decl., Ex. 26.)  On August 7, 2014, Henselen received an email from Anderson with an updated draft of the Annuity Contract and in the text of the email Anderson wrote: "Updated annuity contract and BVI attorney signed-off annuity documents."  (Murzyn Decl., Ex. 27.)  The front page of the draft annuity attached to the email showed that the nominal purchase price of the annuity contract was $25,250,000 and capitalized on the front page of the term sheet was the name of the annuity provider, Wealth Assurance Private Client in Tortola, British Virgin Islands.  (Murzyn Decl. Ex. 27.)

Henselen testified that it was his practice to only review documents to which USB was a signor which, in this case, was the indenture agreement.  (Murzyn Decl. Ex. 8, Henselen Dep.

63:22-64:4.)  This was so even though USB's expert testified that it is important for an indenture trustee to ensure it is the payee on the guaranteed investment contract like the annuity contract in this case which would require review of the Annuity Contract.  In addition, Henselen also testified that it was his responsibility to determine whether or not a deal involved a foreign wire. (Murzyn Decl. Ex. 6, Gadsen Dep. 63:23-64:6; Ex. 8, Henselen Dep. 90:16-24.)  Henselen testified that USB must be aware whether a transaction involves a foreign wire because there are certain reporting requirements for foreign wires.  (Murzyn Decl. Ex. 8, Henselen Dep. 90:16-24.) Additionally, according to USB policy, the presence of a foreign wire escalates the risks related to a particular deal.  (Murzyn Decl. Ex. 8, Henselen Dep. 91:22-25.)  Henselen's supervisor testified that under USB policies, account managers are supposed to be aware if USB would be making an overseas wire for the payment of an investment and that he would have expected an account manager to review a guaranteed investment contract if it was an overseas contract. (Murzyn Decl. Ex. 16, Von Hess Dep. 53:11-55:14.)  In the "Establish Deal" form for the August 2014 WLCC bond offering, Henselen indicated that "[a]ll aspects of the transaction governed by U.S. Law" despite the choice of law clause in the Annuity Contract providing that the contract would be governed under the laws of the British Virgin Islands.  (Murzyn Decl. Ex. 27.)  Henselsen would not have been aware of the foreign law component as he had not reviewed the Annuity Contract.

USB's expert testified that an indenture trustee should understand unique characteristics of this bond transaction:

> Counsel:  Based on your view of industry customs and practices would a reasonable trustee looking at whether to accept this deal ask the question of why an entity of an impoverished tribe would be dealing with a small broker-dealer, New York broker-dealer placement agent to a project that is going to be funded mostly from an overseas annuity?

> Expert:  I guess I would say that the trustee would understand the characteristics of the transaction which include those in this case and it would be part of the trustee's thinking and account acceptance process.

(Murzyn Decl. Ex. 6, Gadsen Dep. 159:20-160:18.)  Approximately $22-$23 million dollars of the $25 million August 2014 bond proceeds were to be wired to an overseas entity in the British Virgin Islands which Vinella identified as a jurisdiction at risk for financial fraud.  (Druck Decl. Ex. A, Vinella Rpt. 81(e).)  Although USB was not always the custodian of a guaranteed

investment in a bond offering, neither Henselen nor USB's counsel had ever worked on a bond issuance where assets would be custodied outside the United States.  (Murzyn Decl. Ex. 8, Henselen Dep. 26:17-24; Ex. 14, Slania Dep. 34:17-35:16.)  An employee of USB's corporate trust risk management department testified that whether or not bond funds will remain onshore is a factor to consider in terms of account acceptance.  (Murzyn Decl. Ex. 15,  Strodthoff Dep. 79:19-80:8.)

Despite the language in the Annuity Contract providing that the  purchase payment must be received at the "Home Office" (defined in the Annuity Contract as the British Virgin Islands), on August 26, 2014, acting upon directions in an email from Galanis and forwarded by Anderson (an email in which neither WLCC nor its counsel was copied), USB wired $22,092,089 to an entity named Wealth Assurance Private Client located in Santa Monica, California, with a JPMorgan Chase N.A. bank account in Beverly Hills, California.  Neither WLCC nor its counsel was copied on the wire instructions email despite the fact that Section 12.13 of Indenture Agreement limited USB's authority to act on email instructions relating to the Indenture to those provided by authorized representatives of WLCC.  No payments were ever sent to Wealth Assurance Private Client in the British Virgin Islands, the entity to which payment was supposed to made pursuant to the Annuity Contracts in all of the WLCC bond issuances.

It is worth noting that in addition to the "red flags" present on the face of this deal, USB was unfamiliar with many of the parties to this transaction.  Representatives from USB were not familiar with, nor had ever worked with Burnham, WLCC, nor Wealth Assurance Private Client prior to this deal.  (Murzyn Decl. Ex. 14, Slania Dep. 193:3-18; Ex. 8, Henselen Dep. 22-25, 32:5-10, 205:15-206:4; Ex. 16, Von Hess Dep. 47:8-15.).  A FINRA BrokerCheck Report indicates that Burnham had been sanctioned for disclosure issues in the past and ultimately, Wealth Assurance Private was not created until August 22, 2012, just three days prior to closing of the August 2014 bond issuance.  (Murzyn Decl. Ex. 113; Pentelovitch Decl., Ex. 1.)

As a provider of professional services, the Court concludes that at a minimum, USB owed bondholders an independent duty to understand the structure of this complex transaction, the nature of the development project, and to recognize the "red flags" present on the face of this deal, and if present, to investigate them further.  Whether there was negligence by USB and whether that negligence proximately caused damages to Plaintiffs is for the jury to decide.

Questions of material fact exist on these issues and Plaintiffs' negligence claim will be heard by a jury.

### 2. Proximate Causation

#### i.      Superseding Cause

USB argues that it is entitled to summary judgment because the criminal acts of third parties were the superseding cause of Plaintiffs' losses.  With regard to the August 2014 bonds, Hirst pleaded guilty to securities fraud and investment advisor fraud, and conspiracy to commit both, as a result of his signing the trade tickets for purchases by Birmingham Water, Washington Suburban, and RHCT despite knowing that it was improper to do so.[8]   (SOMF 475-76.) Morton pleaded guilty to conspiracy to commit securities fraud and investment advisor fraud for failing to disclose material conflicts of interest to the client before purchasing the April 2015 WLCC bonds.   (SOMF 473.)[9]      In both the 2014 and 2015 bond issuances, Dunkerley misappropriated the bulk of the proceeds from the sale of the bonds and pleaded guilty to such crimes.  (SOMF 469-70.)

"Proximate cause is defined as 'a cause that produces a result in a natural and probable sequence and without which the result would not have occurred.  Such cause need not be the only cause of a result.  It may act in combination with other causes to produce a result.'" *Howard v. Bennett*, 894 N.W.2d 391, 395 (S.D. 2017) (quoting *Hamilton v. Sommers*, 855 N.W.2d 855, 867 (S.D. 2014)).  However, "[w]hen the natural and continuous sequence of causal connection between the negligent conduct and the injury is interrupted by a new and independent cause, which itself produces the injury, that intervening cause operates to relieve the original wrongdoer of liability." *Id.* (quoting *Braun v. New Hope Twp*, 646 N.W.2d 737, 740 (S.D. 2002) (stating also that a superseding cause arises because an "intervening force prevents the original actor's antecedent negligence from becoming a legal cause in bringing about the harm to another.").  "An intervening cause that cuts off liability is a superseding cause if it 'so entirely supersede[s] the operation of the defendant's negligence that it alone, without his negligence contributing thereto, produces the injury.'"  *Id.* (quoting *Braun*, 646 N.W.2d at 740).

---

[8] Hirst has since moved to vacate, set aside, or correct his sentence, but the court has not ruled on Hirst's motion. (SOMF 477.)
[9] Morton has since moved to withdraw her guilty plea, but the court has not yet rule don Morton's motion.  (SOMF 474.)

When harm results from an intentional tortious or criminal act of a third party, "under the rules set forth in 302B, 448, and 449 of the Restatement (Second), the defendant will be liable only if the risk created by the defendant's negligence included the hazard that the defendant's conduct would induce a third party to commit such an act." *Snell v. Norwalk Yellow Cab, Inc.*, 212 A.3d 646, 670 (Conn. 2019).  A defendant's liability in such cases depends on the foreseeability of the third party's criminal misconduct. *Id.*; *see also Santaiti v. Town of Ramapo*, 162 A.D.3d 921, 927 (N.Y. App. Ct. 2018) ("[A]lthough 'an intervening intentional or criminal act will generally sever the liability of the original tort-feasor,' this principle 'has no application when the intentional or criminal intervention of a third party or parties is reasonably foreseeable.'"); *Small v. McKennan Hosp.*, 437 N.W.2d 194, 202 (S.D. 1989) (stating that Restatement (Second) of Torts § 448 indicates that a criminal act can be a superseding cause if it was not foreseeable); *Wallinga v. Johnson*, 131 N.W.2d 216, 219 (Minn. 1964) ("A criminal intervening force [ ] cannot be a legally effective superseding cause unless it possesses the attribute of unforeseeability.").

"[I]n any case where there might be a reasonable difference of opinion as to the foreseeability of a particular risk [or] the reasonableness of the defendant's conduct with respect to it . . . the question is for the jury." *Howard v. Bennett*, 894 N.W.2d 391, 395 (S.D. 2017).  It a question of law for the court only where the facts are not in dispute and reasonable minds could not differ.  *Id.*; *see also Holmes v. Wegman Oil Co.*, 492 N.W.2d 107, 114 (S.D. 1992).

The Court concludes that it is for a jury to determine whether the criminal acts of third parties in this case were foreseeable and within the scope of the risk created by any conduct by USB determined by the jury to be negligent.  *See Snell*, 212 A.3d at 758.  The August 2014 bond issuance involved an undefined development project that was, contrary to custom and practice in the industry, primarily funded by an annuity, the provider of which was located in a country which Plaintiffs' expert identified as a jurisdiction at risk of financial fraud.  The deal involved unfamiliar deal team members, many of whom changed throughout the transaction.  The Court finds that under the facts of this case, reasonable minds could differ on the foreseeable risk created by USB' alleged negligence.

ii.     *In Pari Delicto*

USB moves for summary judgment under the doctrine of *in pari delicto*, on claims by the Master Fund and Feeder Fund relating to the April 2015 WLCC Bond Issuance.

In South Dakota, courts recognize the doctrine of *in pari delicto* which provides that:

> … where one is engaged with another in the simultaneous [wrongful conduct] . . . he cannot recover damages for injuries inflicted upon him through the negligence of his joint wrongdoer unless the violation . . . *was not a contributing cause* of the injuries . . .

*Quick v. Samp*, 697 N.W.2d 741, 747 (S.D. 2005) (citation omitted).

USB argues that because Morton, as CEO of Atlantic, had control over the Feeder Fund and Master Fund when it came to the WLCC Bond purchase, and used both entities to fraudulently divert the OSERS investment to purchase the tribal bonds, the Feeder Fund and Master Fund are precluded from recovering damages under the doctrine of *in pari delicto*. (Reply Br. at 30-31.)  In order for USB to avail itself of the defense of *in pari delicto*, it must prove that Morton's wrongful conduct can be imputed to plaintiffs Feeder Fund and Master Fund.  *In re E.S.* Bankest, *L.C.*, Bankruptcy No. 04-18602, 2010 WL 2926203, at *2 (S.D. Fla. Jul. 23, 2010) ("[I]f wrongful conduct cannot be "imputed" to the corporation, there is no *in pari delicto* either.") (citing *O'Halloran v. Price WaterhouseCoopers LLP*, 969 So.2d 1039, 1044 (Fla. Ct. App. 2007)).

USB cites to *Grassmueck v. Am. Shorthorn Ass'n*, 402 F.3d 833 (8th Cir. 2005) in support of its affirmative defense.  In *Grassmueck*, a bankruptcy trustee for various investment partnerships sued the American Shorthorn Association ("ASA") for breaching its duties of care to investment partnerships by disregarding protocols for certifying and registering shorthorn cattle as purebred.  *Id.* at 836.  The investment partnerships purchased cattle from Hoyt Entities by assuming notes owed to Hoyt Entities equal to the price of the cattle.  *Id.*  Investors became partners in the investment partnerships by assuming portions of those notes.  *Id.* at 835.  In the lawsuit, the trustee plaintiff alleged that "ASA aided 'the Hoyts by failing to exercise reasonable care in the performance of their registration and certification obligations to the detriment of the . . . [p]artnerships."  *Id.* at 846.

ASA argued that Hoyt's fraud was chargeable to the investment partnerships and thus, that the doctrine of *in pari delicto* barred their negligence action. *Id.* at 837. The district court acknowledged that under the Uniform Partnership Act, the normal rule of imputing knowledge from one partner to the partnership does not apply when the partner in question is acting fraudulently. *Id.* The court stated that "[t]his is known as the 'adverse interest exception' to the imputation rules. The refusal to impute knowledge to the principal of an agent who is acting adversely to the principal is an acknowledgement that the usual legal fiction of complete agent-principal communication is unjustified where the agent is acting adversely." *Id.*

However, the district court concluded that the adverse interest exception was qualified in the circumstances of the case by the "sole actor doctrine" and granted summary judgment in favor of ASA. *Id.* at 838. "The sole actor doctrine provides that 'where the principal and agent are one and the same,' the agent's knowledge is imputed to the principal despite the fact that the agent is acting adversely to the principal.'" *Id.* (citation omitted); *see also Quick v. Samp*, 697 N.W.2d at 744 n.4 (citing *Grassmuek*, 402 F.3d at 838). "Where the principal and agent are alter egos, there is no reason to apply an adverse interest exception to the normal rules imputing the agent's knowledge to the principal, because 'the party that should have been informed [of the fraudulent conduct] was the agent itself albeit in its capacity as principal.'" *Id.* (citation omitted). The district court found that the investment partnerships were mere alter egos of Hoyt during the period in which he defrauded investors, and held that Hoyt's knowledge was thus properly imputed to the partnerships. *Id.*

On appeal, the court affirmed the district court's application of the "sole actor doctrine" under the facts of the case. The court stated that the investment partnerships lacked independent identities and that there was no way to identify any of the individual investment partnerships because they commingled all assets and liabilities. *Id.* at 840-41. Additionally, Hoyt was made general partner of all of the investment partnerships and in that capacity, received a power of attorney from each investor, thus enabling him to act on the investor's behalf with respect to the investment partnerships. *Id.* at 841. The Eighth Circuit Court of Appeals concluded that Hoyt dominated both the investment partnerships and Hoyt Entities, that his fraud was thus chargeable to the investment partnerships, and affirmed summary judgment for ASA under the doctrine of *in pari delicto*. *Id.*

In the present case, Plaintiffs argue that the adverse interest exception applies because Morton was acting entirely in her own interests and adversely to the interests of the Feeder Fund and Master Fund.  (Opp. Br. at 54.)   USB contends that Plaintiffs have not shown that the interests of Morton and Atlantic varied from those the Master Fund and Feeder Fund to meet the adverse interest exception.  Additionally, USB argues that because Atlantic and Morton, as CEO, so controlled the Feeder Fund and Master Fund, any malfeasance by Atlantic is directly attributable to the Feeder Fund and Master Fund.  (Reply Br. at 30-31.)

The relationship between Atlantic, the Feeder Fund, and the Master Fund is somewhat complex.  The Court understands from the record that the Master Fund is a Cayman Islands exempted limited partnership.  (Statement of Material Facts "SOMF" 13.)  Its general partner is Atlantic GYOF GP, LLC, a Delaware limited liability company that has been replaced by GYOF GP, LLC.  (SOMF 13.)  The Feeder Fund is a Delaware limited liability partnership.  (SOMF 12.)  The parties dispute the identity of the general partner for the Feeder Fund.  USB contends that Atlantic GYOF GP, LLC is the Feeder Fund's general partner whereas Plaintiffs contend that Atlantic GYOF, LLC is the general partner.  (SOMF and Response 12; Murzyn Decl. Ex. 12, Kirschner Dep. at 63:13-64:1; Pentelovitch Decl. Ex. 27.)  The replacement general partner of the Feeder Fund is Goldin Associates, LLC.  (SOMF 12.)  The sole limited partner of the Feeder Fund is OSERS which invested $100 million in the Feeder Fund in 2013 and $25 million in 2015.  (Pentelovitch Decl., Ex. 6, Erickson Dep. 26:22-27:17; 81:21-82:3; Pentelovitch Decl., Ex. 38.)  The Feeder Fund is the sole owner of the Master Fund and invested substantially all of its assets in the Master Fund.  (SOMF 14, 15.)  According to the limited partnership agreements of both the Master Fund and Feeder Fund, the general partners of each entity had the sole authority to make investments on behalf of the partnership and could delegate any and all such responsibilities to an Investment Manager, including, but not limited to, Atlantic Asset Management where Morton served as CEO.  (Pentelovitch Decl. Exs. 27-29.)

The Court concludes that a reasonable inference can be made that Atlantic Asset Management was acting adversely to the Feeder Fund and Master Fund.  OSERS is the sole limited partner of the Feeder Fund, having invested approximately $125 million dollars in the Fund.  The Feeder Fund transferred substantially all of its assets to the Master Fund.  In purchasing the April 2015 WLCC Bonds, Atlantic/Morton allegedly engaged in fraudulent

conduct by failing to disclose multiple conflicts of interest and the fact that the purchases were outside the investment advisory agreement with OSERS, the sole limited partner of the Feeder Fund.  The Master Fund's April 2015 bond holding and the Feeder Funds'/OSERS beneficial interest in such holding are now virtually worthless.

In addition, USB has not shown that the Feeder Fund and Master Fund are alter egos of Atlantic Asset Management such that Morton's knowledge of the fraud may be imputed to the Feeder Fund and Master Fund.[10]  Unlike in *Grassmueck*, there is insufficient evidence in the record for the court to conclude that the Feeder Fund, Master Fund and Atlantic are "one and the same."  *Grassmueck*, 402 F.3d at 837.  The fact that the general partners of the Feeder Fund and Master Fund could delegate investment management authority to Atlantic Asset Management, and perhaps did so, is insufficient for the Court to rule as a matter of law that the Feeder Fund are alter egos of Atlantic Asset Management are thus *in pari delicto*.

### A.  Breach of Contract

"The elements of a breach of contract are (1) an enforceable promise; (2) a breach of the promise; and (3) resulting damages." *Bowes Constr., Inc. v. S.D. Dept. of Transp.*, 793 N.W.2d 36, 43 (S.D. 2010).  Further, "[i]n every breach of contract case, there must be a causal relationship between the alleged damages sustained and the breach." *Morris, Inc. v. State, ex rel. State Dept. of Transp.*, 806 N.W.2d 894, 903 (S.D. 2011).  This requires Plaintiffs to show that the damages were "proximately caused [by]... or, which, in the ordinary course of things, would be likely to result from" the breach. *See* S.D.C.L. § 21-2-1.[11]

---

[10]

Even though Morton invested the Master Fund's  assets in the April 2015 bond does not mean that it had authority to invest those assets.

[11]

South Dakota law provides:

> For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom.  No damages can be recovered for a breach of contract which are not clearly ascertainable in both their nature and their origin.

S.D.C.L. § 21-2-1.

Although contract interpretation is a question of law, *Ziegler Furniture & Funeral Home, Inc. v. Cicmanec*, 709 N.W.2d 350, 354 (S.D. 2006), "[w]hether a contract has been breached is a pure question of fact for the trier of fact to resolve." *Weitzel v. Sioux Valley Heart Partners*, 714 N.W.2d 884, 894 (S.D. 2006).

The goal of contract interpretation is to determine the parties' intent. *Tri-City Ass., L.P. v. Belmont, Inc.*, 845 N.W.2d 911, 915 (S.D. 2014). To determine intent, we look "to the language that the parties used in the contract[.]" *Detmers v. Costner,* 814 N.W.2d 146, 151 (S.D. 2012)). We do not, however, interpret "particular words and phrases ... in isolation." *Casey Ranch Ltd. P'ship v. Casey,* 773 N.W.2d 816, 821 (S.D. 2009). Nor do we interpret language "in a manner that renders a portion of [the contract] meaningless." *Estate of Fisher v. Fisher,* 645 N.W.2d 841, 846 (S.D. 2002) (citation omitted). Instead, we interpret the contract to give "a reasonable and effective meaning to all [its] terms[.]" *Casey Ranch,* 773 N.W.2d at 821.

### 1. *Wire Instructions*

Plaintiffs argue that Section 12.13 of the August 2014 Indenture prohibited USB from releasing bond proceeds based on email instructions from Galanis, forwarded by Anderson, because the emails were not signed by authorized representatives of WLCC. Section 12.13, which is titled "Electronic Communications," provides in relevant part:

> The Trustee shall have the right to accept and act upon instructions or directions pursuant to this Indenture sent by unsecured e-mail, facsimile transmission or other similar unsecured methods, provided, however, that the instructions or directions shall be signed by a person as may be designated and authorized to sign for the Corporation, who shall provide to the Trustee an incumbency certificate listing such designated persons . . . If the Corporation elects to give the Trustee e-mail or facsimile instructions . . . and the Trustee in its discretion elects to act upon such instructions, the Trustee's understanding of such instructions shall be deemed controlling. The Trustee shall not be liable for any losses, costs or expenses arising directly or indirectly from the Trustee's reliance upon and compliance with such instructions notwithstanding such instructions conflict or are inconsistent with a subsequent written instruction. The Corporation agrees to assume all risks arising out of the use of such electronic methods . . . .

(SOMF 271.)

USB argues that 12.13 does not impose any duty or obligation on USB, but rather grants USB a permissive right, which, if exercised by USB, serves as an affirmative defense to certain

claims.  (Opening Br. at 45.)  Because WLCC did not elect to give USB email instructions, USB argues that this provision does not apply.  USB argues that construing Section 12.13 as imposing an affirmative duty on USB conflicts with Section 10.1 of the August 2014 Indenture which provides that "[t]he permissive rights of [USB] shall not be construed as duties."

In response, Plaintiffs construe Section 12.13 as giving USB the right to act upon instructions pursuant to the Indenture sent by unsecured e-mail, but only if such instructions or directions are from a person designated and authorized to sign for WLCC.  The Court agrees. Any other construction of Section 12.13 would render meaningless the limitation on USB's right to accept unsecured email directions pursuant to the Indenture and would have the effect of allowing USB to accept electronic instructions from anyone, not just authorized WLCC signers. (Opening Br. at 21 (citing *Tri-City Assocs., L.P.*, 845 N.W.2d at 915 (stating that a contract must be interpreted in a manner that does not render a portion of the contract meaningless)).

### 2.  *Section 10.9 – Good Faith*

USB argues that because it acted on a good faith belief that the instructions it received were genuine and passed or signed by the proper person, it may not be held liable under Section 10.9 of the Indenture Agreements.  Section 10.9 of the Indenture Agreements provides that:

> The Trustee shall be fully protected and shall incur no liability in acting or proceeding in good faith upon any resolution, opinion, notice, telegram, request, requisition, consent, waiver, certificate, statement, affidavit, voucher, bond, or other paper or document which it shall in good faith believe to be genuine and to have been passed or signed by the proper board or person or to have been prepared and furnished pursuant to any of the provisions of this Indenture, and the Trustee shall be under no duty to make any investigation or inquiry as to any statements contained or matters referred to in any such instrument but may accept and rely upon the same as conclusive evidence of the trust and accuracy of such statements.

(SOMF 266.)

USB argues that it is entitled to summary judgment on Plaintiff's breach of contract claim because Plaintiffs have failed to show that USB did not have a "good faith" belief, which it defines as "honesty in fact concerning conduct or a transaction," that the email by Anderson was genuine and that the email was passed or signed by the proper person.  In support, USB cites testimony from lawyers working on the transaction who believed that the terms of the 2014

Indenture did not require that the wire transfer email be provided by WLCC.  (Opening Br. at 47.)  USB contends that in the Closing Statement delivered to USB pursuant to Sections 2.11 and 2.12 of the August 2014 Indenture, WLCC authorized USB bank to purchase the Annuity Investment and that Anderson's email relates to this authorization.  (Opening Br. at 47-48.)

Plaintiffs argue that pursuant to the South Dakota U.C.C., in addition to proving the subjective element of "honesty in fact," USB must prove the objective element of the observance of "reasonable commercial standards and fair dealing."  (Opp. Br. at 27 (citing S.D.C.L. § 57A-1-201(b) (20)).

The Court was unable to locate any caselaw that would support the application of the U.C.C. to a breach of trust indenture claim as urged by Plaintiffs.  If breach of trust indenture claims were governed by the U.C.C., it would appear that such claims would also be subject to the four-year statute of limitations governing contracts under the U.C.C.  *See* U.C.C. § 2-725(1). Instead, in cases involving an alleged breach of a trust indenture, courts have applied state law breach of contract statutes of limitations. *See Cruden v. Bank of N.Y.*, 957 F.2d 961, 967 (2d Cir. 1992) (applying New York's 6-year breach of contract statute of limitations to breach of trust indenture claim).

In addition, the Court was unable to locate any cases suggesting that "reasonable commercial standard and fair dealing" applied to breach of trust indenture claims.  A federal district court in California stated that "[i]n the indenture trustee context, acting in good faith means that the trustee does not have actual knowledge of contradicting information in the particular certificate of opinion."  *In re Med. Capital Secs. Litig.*, Civ. No. ML 10-2145 DOC, 2010 WL 11508332, *4 (C.D. Cal. 2010) (citing Robert I. Landau & John E. Krueger, *Corporate Trust Admin. & Mgmt. 67* (5th ed. 1998)); *c.f. Caplin v. Marine Midland Grace Tr. Co. of N.Y.*, 406 U.S. 416, 439 (1972) ("While the indenture trustee may rely on certificate or opinions concerning the trust of statements and the correctness of opinions 'in the absence of bad faith' (15 U.S.C. § 77ooo(a)(2) [("TIA")], it is not exempt from liability 'for its own negligent action, its own negligent failure to act, or its own willful misconduct' (15 U.S.C. § 77ooo(d)), save for errors in judgment made in good faith.").

The Indentures in this case are governed by South Dakota law.  Under South Dakota law, acting in good faith means "performing honestly, with proper motive, even if negligently.  The

standard for determining good faith is a defendant's honest belief in the suitability of the actions taken." *B.W. v. Meade Cty.*, 534 N.W.2d 595, 598 (S.D. 1995) (internal citations omitted); *see also* S.D.C.L. § 55-7-3; *Domson, Inc. v. Kadrmas Lee & Jackson, Inc.*, 918 N.W.2d 396, 404 (S.D. 2018).

"Good faith is ordinarily a fact issue for the jury." *Cont'l Grain Co. v. Heritage Bank*, 548 N.W.2d 507, 513 (S.D. 1996) (Konenkamp, J., concurring) (citing *Kunkel v. United Security Ins. Co.*, 168 N.W.2d 723, 730 (S.D. 1969)).  In addition, the Court concludes that questions of material fact exist as to whether USB had a good faith belief the Galanis/Anderson email was "passed or signed by the proper board or person" or was otherwise "furnished pursuant to any of the provisions of [the Indenture]." *See* Indenture, Section 10.9.  While Section 12.13 of the August 2014 Indenture provided that USB was entitled to rely on electronic instructions only from authorized representatives of WLCC, Galanis and Anderson were not authorized representatives of WLCC.  In addition, Henselen testified that he never looked at the Indenture to see if the wire instructions complied with the Indenture's terms.  (Murzyn Decl. Ex. 8, 132:17-131:13.)  Jurors could thus reasonably infer from this that Henselen did not have a good faith belief that the wire instructions email was "passed or signed by the proper board or person" or was otherwise "furnished pursuant to any of the provisions of [the Indenture]." *U.S. Nat'l Bank of Oregon v. Boge*, 311 Or. 550, 564-65 (Or. 1991) ("If a party fails to make an inquiry for the purpose of remaining ignorant of facts . . . he may be found to have acted in bad faith.").

For these reasons, the Court denies USB's motion for summary judgment on this claim.

### 3.  *Section 1.2 - Payment to Annuity Provider and Valuation*

a.  Payment to Annuity Provider – August 2014 Bonds

The Indentures provided that USB was required to pay bond proceeds as set forth in the Closing Statement[12] and for the purchase of the Annuity Investment.  Specifically, Section 2.12 of the Indentures provided:

---

[12]

 The Closing Statement did not specify to whom USB was deliver bond proceeds for the purchase of the Annuity Investment.  Instead, it specified that the $24,844,089 in bond proceeds would be disbursed as follows: $22,094,089 annuity purchase payment; $2,250,000 for the Project Fund re: Junction 18 Development; and $500,000 for Payment of Issuance Costs.

34

> The proceeds of the [ ] Bonds shall be paid over to the Trustee and deposited by the Trustee in the "Settlement Account," which is hereby established.  From the Settlement Account the Trustee shall make the payments, disbursements and deposits as set forth in the Closing Statement required by Section 2.11, including, inter alia, the amount of $22,094,089 for the purchase of the Annuity Investment.

USB's argues that the August 2014 Indenture did not prohibit USB from relying on the directions in Anderson's email requesting that USB wire $22,094,089 for the purchase of the Annuity Investment because neither the Indenture nor the Closing Statement identified the Annuity Provider or the address to which to send the purchase price of the Annuity Investments.

Section 2.11 of the Indenture clearly allows USB to make payments and disbursements as provided in the Closing Statement, signed by authorized representatives of WLCC.  Just because the Closing Statement did not provide to whom or where USB was supposed to make payments for the purchase of the Annuity Investment does not mean that USB was contractually free to disburse more than $22 million in bond proceeds to any entity designated in Galanis/Anderson email.[13]  The terms of the Indenture do not give USB this discretion.  What the terms of the Indenture do provide is that USB shall make a payment of $22,094,089 for the purchase of the "Annuity Investment," defined in Section 1.2 of the Indenture as:

> [T]the contract, in the notional purchase amount of $22,094,089, entered into on the date hereof between [WLCC] and the Annuity Provider, whereby the Annuity Provider shall pay income to [WLCC] at stated intervals and amounts, as provided therein.

The $22,094,089 Annuity Contract referenced in the Indenture designates as the Annuity Provider Wealth Assurance Private Client, a British Virgin Islands corporation, with a home office located in Tortola, British Virgin Islands.  In lieu of alternate wire instructions in the

---

[13]    The Court also notes USB's argument that it had no contractual obligation to determine whether or not Wealth Assurance Private Client satisfied the definition of an "Annuity Provider"—a company that provides Annuity Investments as part of its regular trade or business—provided in the Indenture.  Reply Br. at 19-20.  If USB had no contractual limitation on the annuity provider to which it could wire the bond proceeds, and no implied duty to investigate whether the entity designated as the recipient of the funds was an Annuity Provider, USB would be contractually free to wire the money to *any* entity designated in the Anderson/Galanis email.

USB acknowledges in its brief that "WLCC chose [Wealth Assurance Private Client] as the Annuity Provider before the Closing Statement was signed and delivered to [USB]."  Reply Br. at 19.  USB is correct.  As shown in the distribution sheet emailed to Henselen (account manager of the WLCC bonds at USB) at the early stages of the deal, and as shown in the Annuity Contract that had been emailed to Henselen prior to closing, WLCC chose Wealth Assurance Private Client, a British Virgin Islands company as the Annuity Provider.  Yet, without WLCC's consent, USB proceeded to wire $22,094,089 to a completely different entity--Wealth Assurance Private Client in Santa Monica, California.

Closing Statement, the Court concludes that USB was contractually obligated to wire the bond proceeds to the Annuity Provider designated in the Annuity Contract that was referenced in Section 1.2 of Indenture.

The fact that USB was not a signor to the Annuity Contract does not mean that the Court may not interpret the Annuity Contract and the Indenture together.  In South Dakota, "[a]ll writings that are executed together as part of a single transaction are to be interpreted together." *MetaBank v. Conduent Business Servs., LLC*, Civ. No. 19-4138, 2020 WL 2065279, at *2 (J. Schreier) (Apr. 29, 2020) (quoting *Baker v. Wilburn*, 456 N.W.2d 304, 306 (S.D. 1990)).  "[I]t is not critical whether the documents were executed at exactly the same time or whether the parties to each agreement were identical."  *Id.* (quoting *Baker*, 456 N.W.2d at 306).  "Where several writings are connected by internal references to each other, even if they . . . were not among all of the same parties, they will constitute a single contract as long as they involve the same subject matter and prove to be parts of an entire transaction."  *Id.* (quoting *Baker*, 456 N.W.2d at 306).

South Dakota courts consider numerous factors in determining whether two contracts must be interpreted together, including whether one contract was an inducement for a party to enter the other.  *Id.* at *3 (citing *Kramer v. William F. Murphy Self-Declaration of Trusts*, 816 N.W.2d 813, 815 (S.D. 2012)).  "[H]inging one contract upon the execution of another contract . . . heightens the need for joint interpretation."  *Dakota Gasification Co. v. Nat'l Gas Pipeline Co. of Am.*, 964 F.2d 732, 735 (8th Cir. 1992).  Courts also consider whether contracts were executed on the same day and whether one contract references another.  *MetaBank*, 2020 WL 2065279 at *3 (citing *Kramer*, 816 N.W.2d at 815-16).  Such factors evince whether two contracts "'represent successive steps'" in the same transaction and thus, whether the parties intended them to be read as one.  *Id.* (citing *Kramer*, 816 N.W.2d at 816 (quoting *Dakota Gasification Co.*, 964 F.2d at 734-35).

Here, the August 2014 Indenture and the August 2014 Annuity Contract were executed within one day of each other on August 25 and August 26, respectively.  Although USB was not a signor to the Annuity Contract, it received copies of the Annuity Contract to keep as Trustee and because it was the designated therein as the Payee of the Annuity Investment.  USB received and retained copies of the Indenture and Closing Statement as well.  The August 2014 Indenture specifically references not only the Closing Statement, but also the Annuity Contract.  Section

2.12 provides that USB shall pay bond proceeds for the purchase of the Annuity Investment, defined as "the contract, in the notional purchase amount of $22,094,089, entered into on the date hereof between [WLCC] and [the Annuity Provider]. . . ."  Although the Annuity Contract does not expressly state that it was entered into in reliance upon the Indenture, the Annuity Contract does reference and define the Trust Indenture as "that certain Trust Indenture executed and delivered prior to the execution and delivery of [the Annuity Contract] by and between [WLCC] and [USB]." Similar to the *MetaBank* case, the Court concludes that the Annuity Contract "has no meaning outside the context of the" Indenture Agreement and the parties would not have entered into the Annuity Contract absent the Indenture Agreement.  *MetaBank*, 2020 WL 2065279 at *3.  "This shows that the two contracts[14] 'represent successive steps' in the same transaction and thus, that the parties intended them to be read as one."  *Id.* (citing *Kramer*, 816 N.W.2d at 816 (quoting *Daktoa Gasification Co.*, 964 F.2d at 734-35)).

In doing so, the Court concludes that absent directions in the Closing Statement as to whom and where USB was to make payment for the purchase of the Annuity Investment, USB was contractually obligated to make payment to Wealth Assurance Private Client, a British Virgin Islands corporation.

For this reason, USB's motion for summary judgment as to this claim is denied.

    b.  Valuation – August 2014 and April 2015 Bonds

Plaintiffs contend that USB was required under Section 1.2 of the August 2014 and April 2015 Indentures to value the Annuity Investment on a monthly basis.  The Court agrees.

Section 2.12 of the Indenture provides that the bond proceeds are to be transferred by USB to the Settlement Account out of which, per Section 2.12's terms, USB was to make payment for the purchase of the "Annuity Investment."  Under Section 1.2, an "Annuity Investment" is defined as an "Investment Security" whose value "shall be determined as of the end of each month" as "established by agreement between [WLCC] and [USB.]"

USB's Motion for Summary Judgment is thus denied as to this claim.

---

[14] The parties do not dispute that the Closing Statement, which is also referenced in the Indenture, is be interpreted together with the Indenture.

### 1. *Unauthorized Requisition Payments*

Plaintiffs argue that USB breached the Indentures by paying operating expenses of the Project Fund without having requisitions signed by the President or Vice President of WLCC. Opp. Br. 14.  USB had paid several requisition requests signed by Raycen Raines, who was not the President or Vice President of WLCC and was not otherwise an authorized signor for WLCC.  (Murzyn Decl. Ex. 54.)  Section 5.7(b) of the Indentures provides that "payments shall be made from the Project Fund by the Trustee for Costs" of the Tribe's development project "upon the order for [WLCC], and receipt of a requisition [ ] signed by the President or the Vice-President of the Corporation and by its Secretary, and approved by the Developer. . . ."  Section 8.9 of the Indentures provides that "[WLCC] shall not make any payment or requisition for Operating Expenses in excess of the amount of the annual budget then in effect."  Plaintiffs argue that USB breached Section 8.9 of the Indentures because it made payment for Project Operating Expenses without having an annual budget.  Opp. Br. at 38.

USB contends that the damages flowing from USB's conduct are speculative.  In response, Plaintiffs argue that additional money would have been available for Plaintiffs' recovery absent USB's conduct since Section 5.7(a) of the Indentures provides that in the event of default, "amounts on deposit in the Project Fund shall not be disbursed, but shall instead by applied to the payment of debt service or redemption price of the [ ] Bonds to the extent other funds are not available to make such payments."  The Court will allow Plaintiffs to present evidence in support of this claim.  USB's motion for summary judgment is denied as to this claim.

## I.      USB's Motion to Sever

Pending before the Court is USB's Motion to Sever.  Doc. 112.  USB's Motion to Sever is denied for the reasons set forth by the Court in its April 10, 2020, telephonic conference.  Doc. 148.  The Court finds that the 2014 Claims and 2015 Claims arise from the same set of facts, are substantially similar, and that witnesses and evidence will largely be duplicative between the two sets of claims.  Any juror confusion may be cured by proper jury instructions.  Most importantly, the Court does not find any prejudice, let alone unfair prejudice, to USB will result by trying the claims in a single trial.

Accordingly, it is hereby ORDERED that:

1) USB's Motion for Summary Judgment, Doc. 98, is DENIED; and

2) USB's Motion to Exclude Expert Testimony of Peter Vinella, Doc. 109, is GRANTED IN PART and DENIED IN PART as follows:

    a. Vinella will not be permitted to testify to actions USB would have taken, but may testify to what actions an indenture trustee should take; and

    b. Vinella's opinions in his Report and in his Rebuttal Report cover approximately 170 pages.  The Court is not going to go through and rule on each opinion as some of that would be advisory opinions as some of the opinions might not even be offered at trial.  Instead, the Court in its discussions on pages 14 through 18 of this Memorandum Opinion sets forth some of the guidelines the Court will use when ruling on objections at trial; and

3) USB's Motion to Sever, Doc. 112, is DENIED.

Dated this 10th day of June, 2020.

BY THE COURT:

Lawrence L. Piersol
United States District Judge

ATTEST:
MATTHEW W. THELEN, CLERK

39